# WADSWORTH v. BOYSEN.

(Circuit Court of Appeals, Eighth Circuit. November 23, 1906.)

## No. 2,456.

**1. INDIANS—TREATY CEDING LANDS—CONSTRUCTION AND EFFECT OF AMENDMENT BY CONGRESS.**

Complainant entered into a lease with the Shoshone and Arapahoe tribes of Indians in Wyoming by which he acquired the right to mine coal for 10 years on the leased lands, which included 178,000 acres in the Wind River reservation, and said lease was approved by the Secretary of the Interior in accordance with law. During its term Congress, by Act March 3, 1905, c. 1452, 33 Stat. 1016, ratified an agreement by which the Indians ceded, to be disposed of by the government for their benefit, "all the lands embraced within the said reservation," except certain described lands, which were retained as a diminished reservation, and which included a part of the leased lands. Article 2 of the agreement was amended by such act, by adding a proviso that nothing therein should impair complainant's rights under his lease, but he should have "for thirty days from the date of the approval of the surveys of said land a preferential right to locate, following the government surveys, not to exceed 640 acres in the form of a square of mineral or coal lands in said reservation," and to purchase the same "at the rate of ten dollars per acre, and surrender said lease and the same shall be canceled." *Held*, first, that the proviso was not in conflict with the original agreement as made with the Indians; second, that the agreement as approved did not except the leased lands from those ceded, the special object of the proviso being to obtain a cancellation of the lease, to release the ceded lands therefrom, and facilitate their sale; third, that it did not require complainant to select his 640 acres within the boundaries of the original lease, but left him free to make such selection from any of the ceded lands.

**2. TREATIES—CONSTRUCTION—LEGISLATIVE AMENDMENT.**

Whenever a conflict is alleged to exist between a treaty requiring ratification and a legislative act of amendment, the courts, in construing them, while endeavoring to give effect to both, if they cannot be reconciled, will give effect rather to the legislative amendment.

**3. STATUTES—RULES OF CONSTRUCTION.**

In the interpretation of legislative acts, the rule applies that the words and terms employed, both from their obvious import and context, are to be taken in their ordinary sense where certain to a common intent.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Statutes, §§ 266, 267.]

**4. SAME—DEBATES IN CONGRESS.**

While, in general, the debates in Congress are not appropriate sources of information from which to discover the meaning of the language of a statute passed by that body, yet where the only question of fact is whether Congress, when it adopted an act, understood that under a given proviso the right was given to a beneficiary to select 640 acres of mineral or coal land within a certain area, the statement of members in debate may be resorted to for the purpose of ascertaining the general object of the proviso.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Statutes, § 293.

History and passage of statutes and contemporary circumstances as aids to construction, see note to Mosle v. Bidwell, 65 C. C. A. 535.]

**5. COURTS—JURISDICTION OF FEDERAL COURTS—SUIT AGAINST UNITED STATES.**

A suit to enjoin an Indian agent from obstructing the complainant in prospecting on lands of a reservation for the purpose of making a selection of mineral lands thereon, as he was authorized to do by an act of Congress, is one to restrain an individual tort which would result in irreparable injury to complainant, and not one against the United States, and for that reason not within the jurisdiction of the court, although defendant

claims to be acting in his official capacity as a representative of the government, where such action is without warrant of law.

Appeal from the Circuit Court of the United States for the District of Wyoming.

Timothy F. Burke, U. S. Atty., for appellant.

John W. Lacey and John N. Baldwin, for appellee.

Before SANBORN and VAN DEVANTER, Circuit Judges, and PHILIPS, District Judge.

PHILIPS, District Judge. This is an appeal seeking to reverse the action of the Circuit Court in overruling a demurrer to a bill in equity and granting a temporary injunction. The controversy grows out of the following state of facts:

On the 1st day of July, 1899, the appellee, Asmus Boysen, of the state of Iowa, entered into a contract of lease with the Shoshone and Arapahoe tribes of Indians, occupying the Wind River reservation, in the state of Wyoming, which contract was approved by the Secretary of the Interior. The contract recited that the said Indian tribes were authorized by the provisions of the third section of the act of Congress approved February 28, 1891 (26 Stat. 795, c. 383), as amended by Act Cong. Aug. 15, 1894, c. 290, 28 Stat. 305, to lease the lands for certain purposes, which was ratified by their principal chiefs, etc. This lease embraced a territory of about 178,000 acres. It ran for a period of 10 years, and the use of it was limited to mining coal thereon. The consideration for this lease was the payment of a royalty of 10 per cent. of the cash value of the coal at the mines. While the appellee was thus occupying the leased premises and mining coal thereon, on March 3, 1905, Congress, by Act March 3, 1905, c. 1452, 33 Stat. 1016 et seq., ratified and amended the agreement made between James McLaughlin, United States Indian inspector, respecting their said reservation, whereby said tribes agreed to cede and relinquish to the United States all the right, title, and interest to a portion of the lands embraced in said reservation, within certain prescribed lines, reserving the rights of individual Indians who had made selection of lands to surrender the same and select other lands in lieu thereof within the diminished reserve at any time before the ceded lands were open for entry. In consideration of this cession the United States was to dispose of the ceded lands under the provisions of the homestead, townsite, coal, and mineral land laws, or by cash sale at specified prices, and to hold and distribute the proceeds for the benefit of said Indian tribes in a manner provided in the act. This agreement was accepted and ratified by Congress, with certain amendments made thereto. 33 Stat. 1019, 1021.

The second article of this amended agreement contained the following proviso:

"That nothing herein contained shall impair the rights under the lease to Asmus Boysen, which has been approved by the Secretary of the Interior; but said lessee shall have for thirty days from the date of the approval of the surveys of said land a preferential right to locate, following the government surveys, not to exceed six hundred and forty acres in the form of a square, of mineral

or coal lands in said reservation; that said Boysen at the time of entry of such lands shall pay cash therefor at the rate of ten dollars per acre and surrender said lease and the same shall be canceled. Provided further, that any lands remaining unsold eight years after the said lands shall have been opened to entry may be sold to the highest bidder for cash without regard to the above minimum limit of price; that lands disposed of under the town-site, coal and mineral land laws shall be paid for at the prices provided for by law, and the United States agrees to pay the said Indians the proceeds derived from the sales of said lands, the amount so realized to be paid to and expended for said Indians in the manner hereinafter provided."

As the appellee, Boysen, to avail himself of this provision, had to proceed within 30 days from the date of the approval of the surveys of said ceded lands to make his selection and location of the 640 acres, he at once entered upon the ceded lands with employés and began explorations and examinations to determine the presence of mineral or coal, with the employment of machinery suitable thereto, with a view to making such selection within the prescribed limited time. The appellant, Harry E. Wadsworth, who was at the time the Indian agent in charge of said Indian tribes and reservation, made objection to the said proceedings of the appellee, and forbade his entering upon and selecting said 640 acres outside of the lands embraced within said leased premises. His obstruction went to the extent of suffering the destruction of the machinery so employed by the appellee, and warning him, under threat of forcible ejection, from the lands included in the ceded territory outside of said leased premises. A portion of the leased lands were in the ceded domain, and a portion were within the diminished reserve. The proportion of this division of the leased lands does not affirmatively appear. In this conjuncture the appellee, Boysen, in order to prevent the loss of his right by lapse of the 30-day period, should he carry the contest before the Department of the Interior, filed his bill in equity in the United States Circuit Court for the State of Wyoming against said appellant, Wadsworth, and those concerting with and aiding him in said interference and obstruction, setting out in detail the facts aforesaid, praying for an order and decree enjoining them therefrom. To this bill the United States district attorney for Wyoming interposed a demurrer, which was overruled, and a temporary injunction as prayed was granted.

The chief contention of appellant is (1) that the Indian tribes never assented to the preferential right sought to be given by the act of Congress to the appellee; and (2) that the correct construction of said proviso is that the selection to be made by appellee is limited to 640 acres of mineral or coal lands situate within the boundaries of the original lease.

Is the right reserved to the appellee by the proviso void for the reason that it conflicts with the agreement made with said Indian tribes? The Indian tribes of this country, while somewhat sui generis in their relation to the United States, have ever been recognized as possessing so much of the qualities of national political independence as to be subject to the treaty-making power between them and the government. This is especially so in respect of territory assigned to them as reservations. Such treaties in practice take the form of agreements entered into between the particular tribe and some designated

representative of the Interior Department, or person or persons desig-. nated thereto by act of Congress. Like any other treaty, when not self-executing, which becomes the subject of congressional revision and approval, Congress may modify or amend such provisions as affect the United States or its subjects, or entirely supersede them. In such case, whenever a conflict is alleged to exist between the treaty and the legislative act of amendment, the courts, in construing them, while endeavoring to give force and effect to both, if they cannot be reconciled, will give effect rather to the legislative amendment. Head Money Cases, 112 U. S. 581, 5 Sup. Ct. 247, 28 L. Ed. 798; Whitney v. Robertson, 124 U. S. 190, 194, 8 Sup. Ct. 456, 31 L. Ed. 386. The treaty is of no greater force than the act of Congress, and, when it becomes the subject of judicial cognizance in the courts, it is held to be subject to such provision as Congress may attach by modification or amendment. Chinese Exclusion Case, 130 U. S. 587, 600, 9 Sup. Ct. 623, 32 L. Ed. 1068. This rests upon the established rule that the provisions of an act of Congress, passed in the exercise of its constitutional power, when clear and explicit, will be upheld by the courts, although in seeming conflict with an antecedent treaty stipulation. Fong Yue Ting v. United States, 149 U. S. 698, 13 Sup. Ct. 1016, 37 L. Ed. 905; Ward v. Race Horse, 163 U. S. 511, 16 Sup. Ct. 1076, 41 L. Ed. 244.

We do not, however, perceive any real conflict between the agreement made with the Shoshone and Arapahoe Indian tribes and the act of Congress. The treaty was not self-enforcing, but was made subject to congressional recognition and enforcement, with power to add such amendments thereto as would make it acceptable to Congress. Accordingly Congress did amend it in several particulars, among which was the proviso in favor of the appellee. Appellant was not called upon to complain of any assumed divergence between the agreement and the action of Congress. Neither can we assent to the view expressed by the United States attorney as to the general scope or character of the act in question. He asserts that:

"The act under consideration ratifies the cession of all of the lands north of the Big Wind river, etc., except so much thereof as are described in a certain lease to Asmus Boysen."

The ratification in fact is a confirmation of the cession of "all the lands embraced within the said reservation," except certain described lands, which are not only a part of the leased lands, but the lands retained by said Indians as their diminished reservation. As this contains in fact a part, and only a part, of the leased territory, it follows that the leased lands, as such, are not excepted from the conceded grant, which contains a vastly larger body of lands. We are unable to find any expression in the act indicating an exception of the leased lands from the cession. On the contrary, both the language and scope of the act are to concede to the United States all the lands of the reservation, except the designated territory expressly retained by the Indian tribes as a diminished reservation, the sense and the logic of which, it must be conceded, was the extinguishment of the Indians' rights, sub modo, in "all the lands embraced within said reservation,"

as it existed prior to the cession, saving those expressly reserved. Indeed, one of the considerations expressed in the proviso itself for the preferential right secured to the appellee was that he was to pay at the rate of $10 per acre for 640 acres, "and surrender said lease and the same shall be canceled." It is not perceivable, therefore, how the contention can be upheld that the selection of the 640 acres should be restricted to that part of the leased premises included within the absolute boundary of the ceded land, rather than to any other portion of it.

So far from finding any expression in the act indicating the exception of the leased lands from the cession, it is made clear that, in order that the leased premises within the ceded district should become an integral part thereof, the proviso is that, when the appellee should make his entry of 640 acres, he shall "surrender said lease and the same shall be canceled," whereby the leased premises within the boundary cession would become an integral part of the ceded lands. If the selection of the 640 acres was intended to be from the leased lands, it would be as well within the diminished reservation as the ceded lands—a result utterly contrary to the spirit of the treaty and act of Congress, the express purpose of which was that the entire diminished reserve should remain absolutely free to the exclusive use and occupancy of the Indians. The ceded portion alone was to be subjected to entry and sold to others, to create a permanent fund for the benefit of the Indians. That the 640 acres were to be selected from the ceded lands is further made manifest by the requirement that the selection should be made within 30 days from the approval of the government surveys "of said land," and to be in the form of a square "following the government surveys." The "said land" has reference back for its predicate to the opening words of said article 2 of the act amending and modifying the treaty agreement, to wit: "In consideration of the land ceded, granted," etc. These were the lands to be surveyed by the government, to determine their exact boundaries, following the usual custom in government surveys, by sections, necessary in making sales of the land when opened up for settlement.

To escape from this situation the learned counsel for the government is driven to insist upon interpolating the words "within the leased lands," so as to make the proviso in this respect read as follows: "Said lessee shall have, for thirty days, etc., a preferential right to locate * * * not to exceed six hundred and forty acres * * * of mineral or coal lands within the leased lands of said reservation"—thus inviting the court to commit the offense of amending a legislative act by a bald judicial construction. To escape the absurdity of the appellee, even with such interpolation, being authorized to locate 640 acres within the portion of the leased lands in the diminished reserve, the further words would have to be added, after said reservation, "within the ceded lands"; thus fitly illustrating the indefinite extent to which the courts may be led when once they break through the safeguards of limiting construction to the language of the statute. There is no immunity given to the interpretation of legislative acts from the rule that the words and terms employed, both from their

obvious import and context, are to be conceded their ordinary sense, when certain to a common intent. "A legislative act is to be interpreted according to the intention of the Legislature, apparent on its face. Every technical rule, as to the construction or force of particular terms, must yield to the clear expression of the paramount will of the Legislature." Wilkinson v. Leland, 2 Pet. 627, 662, 7 L. Ed. 542; Parshall v. United States (C. C. A.) 147 Fed. 433.

Mr. Justice Swayne, in United States v. Hartwell, 6 Wall. 385, 396, 18 L. Ed. 830, speaking of the rule of construction according to the manifest legislative intent, said:

"The words must not be narrowed to the exclusion of what the Legislature intended to embrace; but that intention must be gathered from the words, and they must be such as to leave no room for a reasonable doubt upon the subject. It must not be defeated by a forced and overstrict construction. The rule does not exclude the application of common sense to the terms made use of in the act in order to avoid an absurdity, which the Legislature ought not to be presumed to have intended. * * * The proper course in all cases is to adopt that sense of the words which best harmonizes with the context, and promotes in the fullest manner the policy and objects of the Legislature."

Still more pertinent is the language of the learned judge in United States v. Bassett, 2 Story, 389, Fed. Cas. No. 14,539:

"A fortiori, such an interpretation is not to be adopted to give effect to particular words, which will require, on the part of the court, the introduction of new provisions and auxiliary clauses, which the statute neither points out, nor even hints at, and yet which are indispensable to make such interpretation sensible and practicable."

Our attention is directed to the fact that the Solicitor General for the Interior department gave the opinion that the selection of the 640 acres of land by the appellee should be confined to the leased premises, for the reason that:

"The rights conferred upon Boysen are based upon his claims under the lease formerly held by him, and he should accordingly be confined, in his selection, to the lands described in that lease. It was through failure on Boysen's part to comply with the required conditions that his former lease was canceled, and in view of that fact and the rule that grants by the government should be construed in favor of the grantor, it is not perceived why the language and meaning of the act should be stretched so as to enlarge the rights of this grantee flowing from his original lease, or why its provisions should not be construed strictly against his contention that he should be allowed to locate outside the limits of the lease."

The assertion that the rights conferred upon Boysen are based upon his claims under the lease, and therefore his selection should be confined to the lands therein described, it seems to us might have been addressed to the consideration of Congress as a reason why it should have so restricted the field of selection, rather than to the court in construing what the grant actually was. On the face of the proviso Congress recognized the fact to be that the appellee had rights under the lease which it conceived ought not to be so impaired by the agreement it was approving as to leave him unprovided for or unprotected. That consideration was legislative, and is not judicial.

It is next stated in the opinion that "it was through failure on Boysen's part to comply with the required conditions that his former lease was canceled." How this information was derived this court is

not advised. There is nothing in the record to sustain the statement. On the contrary, if resort is to be had to extraneous matters, the debate in Congress, of which the court can take judicial notice, when the proviso in question was under consideration and adopted, clearly shows that it was predicated of the sense of that body, based upon the information presented to the committee having the measure in charge, that it was proper and just, in view of the surrender by appellee of his lease, he should be accorded the right to have the preferential selection of 640 acres anywhere in the ceded domain, for the reason that it was deemed expedient to remove as a cloud on the title to the conceded premises any assertion of his rights under the lease. When Mr. Marshall, of the committee having in charge this measure, presented this amendment to the consideration of the House, the following questions were put to him by Mr. Lind:

"Q. Does not this provision of the bill give the beneficiary a blanket right to select 640 acres of land anywhere on this reservation, after it is opened, by paying $10 an acre for it?

"Mr. Marshall: It does.

"Mr. Lind: Do you, as a member of this House, think it is good policy and good legislation to give any one such a bonus and such a privilege, especially where the land is of so peculiar a character as that on this vast reservation?

"Mr. Marshall: I certainly would not think it wise legislation to give it to any one indiscriminately, but I do think it is wise legislation to give it to a man who has an equity. This is in lieu of the equity that he has.

"Mr. Lind: If he has any equity, why do you not confine it to the land that he claims to have an equity in? * * * If he took a coal land lease, why do not you confine him to his coal land lease?

"Mr. Marshall: Because he had a coal land lease of a tract of 180,000 acres, and in lieu of that we give him the privilege of selecting 640 acres of any kind of land by paying the highest price anybody would pay for it."

Thereupon Mr. Lind inquired of Mr. Mondell, Representative from the district of Wyoming, whether he thought this wise legislation, and Mr. Mondell answered:

"I was not desirous of this provision being placed in the bill. At the same time it is true that there is a question among attorneys whether the lease was legally canceled. If it was not legally canceled, then this is a simple way of disposing of any rights that the man may have."

Mr. Lacey of Iowa, then said:

"A somewhat similar situation arose in relation to the Raven Mining Company upon another reservation, and in order to adjust the matter they were given the prior right on a section of land. Now, the proposition here is to allow Mr. Boysen, who has a floating lease on 178,000 acres, and who after prospecting had narrowed it down to perhaps one-half that amount by filing a plat, to have this prior right of selection in this amount of land on condition that all cloud of his lease over any of the lands should be released at the same time. This is a very fair and reasonable adjustment, because the only effect of striking this amendment out would be to allow somebody else, who is not there, and some man or set of men possibly to take the same amount at some other price, if it is coal land, at $10 an acre, and if it is ordinary mineral land at $2.50 or $5 an acre."

See Congressional Record 58th Congress, Third Session, pp. 2818 and 2819.

No suggestion was made to Congress that the appellee had in any particular broken the terms of his lease. On the contrary, it was recog-

nized that he had so kept faith with the Indian tribes as to create a probable right in him for protection; and to free the situation from possible litigation the preferment right was accorded him in the amendment. It may be conceded as a general rule "that debates in Congress are not appropriate sources of information from which to discover the meaning of the language of a statute passed by that body." United States v. Freight Association, 166 U. S. 318, 17 Sup. Ct. 540, 41 L. Ed. 1007. Yet, in the instance like this, where the only question of fact is whether Congress, when it adopted the act, understood that under a given proviso the beneficiary could select 640 acres of mineral or coal land within a certain area, and the vote was for the declared right, it comes within the rule declared by Mr. Justice Field, on the circuit, in Ho Ah Kow v. Nunan, 5 Sawy. 552, Fed. Cas. No. 6,546:

"The statements of supervisors in debate on the passage of the ordinance cannot, it is true, be resorted to for the purpose of explaining the meaning of the terms used; but they can be resorted to for the purpose of ascertaining the general object of the legislation proposed and the mischiefs sought to be remedied."

So in Jennison v. Kirk, 98 U. S. 453, 459, 25 L. Ed. 240, the court, in construing an act passed by Congress of which Senator Stewart of Nevada was the author, said:

"These statements of the author of the act in advocating its adoption cannot, of course, control its construction, where there is doubt as to its meaning; but they show the condition of mining property on the public lands of the United States, and the tenure by which it was held by miners in the absence of legislation on the subject, and thus serve to indicate the probable intention of Congress in the passage of the act."

Clearly enough it is apparent on the face of the proviso itself that the leasehold interest of the appellee was to be intercepted and ended, and in lieu thereof the preferential right was accorded to him to select anywhere within the ceded territory 640 acres. This construction of the proviso works no injustice to the Indians. The purpose of Congress was to open up a part of the vast territory occupied by the Indians to settlement. The consideration to the Indians was the creation of a large fund to arise from the sale of the ceded lands for their perpetual benefit. The 640 acres to be selected by appellee was not a gift; but at the time of the entry he was to pay $10 per acre and surrender said lease—the maximum price of mineral or coal lands.

The final contention of appellant is that this suit must fail for the reason that the government is the real defendant, which cannot be sued without its consent, and that in determining the question whether or not the suit in fact is against the government, the party named as defendant on the record does not control, but rather is it to be determined by the result of the judgment or decree which may be entered—citing Minnesota v. Hitchcock, 185 U. S. 377, 22 Sup. Ct. 650, 46 L. Ed. 954; Bockfinger v. Foster, 190 U. S. 116, 23 Sup. Ct. 836, 47 L. Ed. 975; Oregon v. Hitchcock, 202 U. S. 60, 26 Sup. Ct. 568, 50 L. Ed. 935; and Naganab v. Hitchcock, 202 U. S. 473, 26 Sup. Ct. 667, 50 L. Ed. 1113.

The first case, that of Minnesota v. Hitchcock, was an attempt to enjoin the Secretary of the Interior and the Commissioner of the

General Land Office from selling certain sections of land in the Red Lake Indian reservation, and the object and effect of the decree sought was to control the disposition of the lands by the Interior Department, the title to which was in the United States. It will be observed that in that case there was consent to the jurisdiction by act of Congress. The court, however, arguendo, said:

"Now, the legal title to these lands is in the United States. * * * The United States is proposing to sell them. This suit seeks to restrain the United States from such sale—to divest the government of its title and vest it in the State. The United States is, therefore, the real party affected by the judgment and against which in fact it will operate."

Of course, in such case the United States is a necessary party to the litigation, and a suit without its consent could not be maintained.

The case of Bockfinger v. Foster, supra, was an application for a mandamus to compel the trustees of a townsite to convey the lands in controversy to the plaintiff. The court said:

"The United States, as the primary owner of the land, could prescribe the terms upon which it could be disposed of to occupants. A suit against the townsite trustees to compel them, without regard to the act of Congress, to convey to one who was not an occupant within the meaning of that act, was a suit to compel them to convey land which really belonged to the United States."

Necessarily the jurisdiction to make such decree was denied.

In Oregon v. Hitchcock, supra, the suit was brought to restrain the Secretary of the Interior and the Commissioner of the General Land Office from allotting or patenting to any Indians or other persons certain described swamp or overflow lands within the limits of Klamaths Indian reservation. This action was clearly within the ruling in Minnesota v. Hitchcock, supra.

The case of Naganab v. Hitchcock, supra, was an attempt to restrain by suit the Secretary of the Interior from carrying out the provisions of an act of Congress respecting the disposition of pine lands ceded to the United States by the Indians. In its opinion the court said:

"It is apparent * * * that it is in effect a suit against the United States to control the disposition of the lands and for an account of the proceeds of the sales of certain lands conveyed by the Indians to the United States under the act of January 14, 1889."

It is obvious that in such cases, where it is sought to obtain a decree controlling in any wise the disposition of the lands of the United States, such decree would operate directly against the government itself; whereas, in the case at bar no decree is sought divesting or affecting the title of the United States to any of its lands, nor does it seek the adjudication of any matter which would affect that title. The case at bar falls within that class where the individual complainant seeks redress against one or more persons for an invasion of his property rights, and who pretend to be acting under warrant of some federal statute or official, in which the complainant asserts that neither the statute nor the public law confers any such right upon the wrongdoer. As said in Noble v. Union River Logging Railroad, 147 U. S. 172, 13 Sup. Ct. 273, 37 L. Ed. 123:

"If he has no power at all to do the act complained of, he is as much subject to an injunction as he would be to a mandamus if he refused to do an act which the law plainly required him to do."

Included in this rule are the cases—

"Where an individual is sued in tort for some act injurious to another in regard to person or property, in which his defense is that he has acted under the orders of the government. In these cases he is not sued as an officer of the government, but as an individual, and the court is not ousted of jurisdiction because he asserts the authority of such officer. To make out that defense he must show that his authority was sufficient in law to protect him. In this class is included United States v. Lee, 106 U. S. 196, 1 Sup. Ct. 240, 27 L. Ed. 171, where the action of ejectment was held to be in its essential character an action of trespass, with the power in the court to restore the possession to the plaintiff as part of the judgment, and the defendants Strong and Kaufman, being sued individually as trespassers, set up their authority as officers of the United States, which this court held to be unlawful, and therefore insufficient as a defense." Stanley v. Schwalby, 147 U. S. 518, 13 Sup. Ct. 418, 37 L. Ed. 259.

To the same effect are the following cases: Meigs v. McClung's Lessee, 9 Cranch, 11, 3 L. Ed. 639; Wilcox v. Jackson, 13 Pet. 498, 10 L. Ed. 264; Grisar v. McDowell, 6 Wall. 363, 18 L. Ed. 863; Brown v. Huger, 21 How. 305, 16 L. Ed. 125; United States v. Schurz, 102 U. S. 378, 26 L. Ed. 167; Marbury v. Madison, 1 Cranch, 137, 2 L. Ed. 60, and Butterworth v. United States ex rel. Hoe, 112 U. S. 50, 5 Sup. Ct. 25, 28 L. Ed. 656.

In the case at bar the appellant was an Indian agent, in charge of the Indian tribes on their reservation. According to the allegations of the bill he was acting without warrant of law, committing a tort, in obstructing and attempting to eject the appellee from prospecting on the lands with a view to making the selection thereon, as he was authorized to do under the act of Congress. The injunction seeks to stay the hand of an individual wrongdoer, to prevent irreparable mischief to the complainant; and consequently such wrongdoer cannot be acting for and in behalf of the government, which stands for the embodiment of law and lawful procedure.

It results that the action of the Circuit Court in granting the temporary injunction was correct, and its decree therefore is affirmed.

VAN DEVANTER, Circuit Judge (concurring). I concur in the decree for the reasons that the act of March 3, 1905, including the provision conferring upon Asmus Boysen a preferential right to locate and to purchase at the rate of $10 per acre not to exceed 640 acres of mineral or coal lands is a valid exercise of the power vested in Congress over tribal Indians and tribal lands, notwithstanding the Indians have not assented to such preferential right (Cherokee Nation v. Hitchcock, 187 U. S. 294, 23 Sup. Ct. 115, 47 L. Ed. 183; Lone Wolf v. Hitchcock, 187 U. S. 553, 23 Sup. Ct. 216, 47 L. Ed. 299); that, rightly interpreted, the act both extends and confines this right to the so-called ceded lands; and that, in attempting to exclude Boysen from examining and locating part of the lands to which his right lawfully extends, Wadsworth was not in the exercise of any authority, judgment, or discretion vested in him by reason of his office, but was entirely without the pale of the law and a wrongdoer, so the suit is not in effect one against the United States.