ROBERTS et al. v. SOUTHERN PAC. CO. et al.

(Circuit Court, S. D. California, N. D.  March 13, 1911.)

No. 177.

1. PUBLIC LANDS (§ 122*)—RAILROAD GRANTS—PATENTED LAND—CONTEST BY STRANGERS TO TITLE.

Strangers to the title to land patented by the United States to a railroad company as part of a railroad grant, whose alleged rights in the land adverse to the railroad company were not initiated until years after the issuance of the patents, could not complain of alleged frauds on the government in issuing the patents.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 339, 340; Dec. Dig. § 122.*]

2. STATUTES (§ 217*)—CONSTRUCTION—DEBATES IN CONGRESS.

While the meaning of a clause in a statute or congressional resolution is to be determined from the language used by Congress, and not by reference to the debates in Congress concerning the same, such debates are nevertheless sources of information from which the court may discover the meaning of the language intended by Congress in passing the act.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. § 293; Dec. Dig. § 217.*]

3. PUBLIC LANDS (§ 78*)—RAILROAD GRANT—PATENTS—RESERVATION.

Act Cong. July 27, 1866, c. 278, § 3, 14 Stat. 294, granted to the Atlantic & Pacific Railroad Company, afterwards to its successor the Southern Pacific Railroad, every alternate section of public land, not mineral, designated by odd numbers, to the amount of 20 alternate sections per mile, on each side of the railroad line, to be adopted by the company, through the territories, and 10 alternate sections through states, whenever on the line thereof the United States has full title, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption or other claims or rights, at the time the line of the road is designated by a plat filed in the office of the Commissioner of the General Land Office. Thereafter, on June 28, 1870, by a joint resolution (Joint Resolution 1870, June 28, No. 87, 16 Stat. 382), the Secretary of the Interior was directed to have made an examination of the road as constructed, and on the report of commissioners to cause patents to be issued to the corporation for the sections of land coterminous to each constructed section, to the extent and amount granted by Act July 27, 1866, expressly saving and preserving all the rights of actual settlers, together with the other conditions and restrictions provided for in the third section of such act. *Held*, that neither the act of 1866, the joint resolution, nor any other law directed, or authorized the insertion in patents to land so granted of a clause, excepting mineral lands other than coal and iron lands, should any such be found within the tracts patented; it being the intention of Congress that the Interior Department should determine the character of the lands by an examination before patent, and that, on the lands being patented, such patent should convey the government's entire title to the land described therein.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 243; Dec. Dig. § 78.*]

4. PUBLIC LANDS (§ 117*)—CONVEYANCE—CHARACTER OF LAND—DETERMINATION BY LAND DEPARTMENT—COLLATERAL ATTACK.

Where Congress has provided for the disposition of any portion of the public domain of a particular character, and has authorized the officers of the Land Department to issue a patent for such land on the ascertainment of certain facts, such department has jurisdiction to

inquire into and determine the existence of those facts, and, in the absence of fraud, imposition, or mistake, its determination is conclusive against collateral attack.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 324; Dec. Dig. § 117.*]

In Equity. Suit by George D. Roberts and others against the Southern Pacific Company and others. On demurrer to bills. Sustained and bills dismissed.

T. S. Minot, Horace Smith, and B. D. Townsend, for complainants.

Wm. Singer, Jr., Guy V. Shoup, J. E. Alexander, D. V. Cowden, Platt & Bayne, and O'Melveny, Stevens & Millikin, for defendants.

ROSS, Circuit Judge. Stripped of the mass of irrelevant and redundant matter contained in the pleadings, the case presented is this: Can a citizen of the United States, or one having declared his intention to become such, lawfully enter upon and claim as mineral ground land theretofore patented by the government to a railroad company under a congressional grant; such patents, after describing the land thereby conveyed, containing the clause:

"Yet excluding and excepting 'all mineral lands,' should any such be found in the tracts aforesaid. But this exclusion and exception according to the terms of the statute, shall not be construed to include 'coal and iron lands.'"

The complainants' alleged rights to the lands in question in this suit were according to their express allegation not acquired until 15 years after the issuance of patents to the Southern Pacific Railroad Company therefor, at which time they claim to have made mineral locations upon them, and by this suit, the nature of which is variously characterized by their counsel, they ask the court to protect their alleged rights as such mineral locators by some sort of injunctive process by "controlling" the patents which were issued by the government, and which they expressly allege conveyed the legal title to the land to the grantee therein named.

If the above quoted clause inserted in the patents had the effect of excepting from the lands described in the granting clause thereof all of such lands in which mineral might thereafter be found, the discovery of mineral in the lands in suit by the complainants, if such has been made as alleged, 15 years after the issuance of the patents, would undoubtedly defeat the grant under which the defendants hold, for the reason that the clause is without limitation as to time, and a determination by a court or jury, as the case might be, at any subsequent date, however remote, that any of the land described in the granting clause of the patents had turned out to be mineral land would thereby necessarily determine that such land was never within the terms of the railroad grant made by Congress, notwithstanding the fact that the officers of the government charged with the duty of inquiring into and determining the question and of issuing the government patent for the lands granted had issued such conveyance. A mere statement of the necessary consequences of the complainants' contention is enough to show that it cannot be sound. It would make

of the patents a delusion and a snare, instead of a muniment of title designed for the peace and security of those holding under them. Undoubtedly, if the lands in suit were known to be mineral lands at the time they were applied for by the railroad company under the congressional grant to it, and if the patenting of them was, as alleged by the complainants, procured by means of the false affidavit of its land agent, or through any other fraud on its part, the government, or any one in privity with the government, could justly complain, and by suit brought within the time fixed by Congress for that purpose procure a cancellation of such patents. But this is not such a suit. Neither the government nor any one in privity with the government title is here complaining. The suit is by strangers to that title, for by the express averments of the bill the complainants' alleged rights were not initiated until years after the issuance of the patents which they expressly allege conveyed to the railroad company the legal title to the lands.

[1] That the complainants cannot be heard to complain of the alleged frauds upon the government is thoroughly settled by decisions so numerous as to make their citation unnecessary. They must be familiar to all lawyers at all acquainted with the law in respect to the public lands. The only real question, therefore, in the case, is whether the lands in suit are excluded from the patents by reason of the alleged subsequent discovery of mineral therein by the complainants under the exception clause inserted in the patents, already quoted, but which I here repeat:

"Yet excluding and excepting 'all mineral lands' should any such be found in the tracts aforesaid. But this exclusion and exception, according to the terms of the statute, shall not be construed to include 'coal and iron lands.' "

Where did the officers of the government charged with the duty of issuing patents for lands granted by Congress get authority to cast upon courts or juries the duty or power of ascertaining and determining the character of the public lands applied for under the grant which Congress devolved upon the Land Department of the government as a prerequisite to the issuance of a patent therefor? The statutes of the United States will be searched in vain for any such authority, unless it can be deduced from the joint resolution of Congress of June 28, 1870 (No. 87, 16 Stat. 382), relating to the grant to the Southern Pacific Railroad Company made by its preceding act of July 27, 1866 (14 Stat. 292, c. 278). By the latter act Congress chartered the Atlantic & Pacific Railroad Company, empowered it to build a railroad commencing at a point at or near Springfield, Mo., along a generally described route to the Colorado river, and, after crossing that river, by the most practicable and eligible route to the Pacific Ocean, granting to such company by the third section of the act:

"Every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile, on each side of said railroad line, as said company may adopt, through the territories of the United States, and ten alternate sections of land per mile on each side of said railroad whenever it passes through any state, and whenever, on the line thereof, the United States have full title, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption or other claims or rights, at the time the line of said road is designated by a plat thereof, filed in the office of the Commissioner of the General Land Office."

The eighteenth section of the act made a grant to the Southern Pacific Railroad Company, and is as follows:

"And be it further enacted, that the Southern Pacific Railroad, a company incorporated under the laws of the state of California, is hereby authorized to connect with the said Atlantic and Pacific Railroad, formed under this act, at such point, near the boundary line of the state of California, as they shall deem most suitable for a railroad line to San Francisco, and shall have a uniform gauge and rate of freight or fare with said road; and in consideration thereof, to aid in its construction, shall have similar grants of land, subject to all the conditions and limitations herein provided, and shall be required to construct its road on the like regulations, as to time and manner, with the Atlantic and Pacific Railroad herein provided for."

By section 4 of the act it was provided that, whenever the railroad company "shall have twenty-five consecutive miles of any portion of said railroad and telegraph line ready for the service contemplated, the President of the United States shall appoint three commissioners to examine the same, who shall be paid a reasonable compensation for their services by the company, to be determined by the Secretary of the Interior; and if it shall appear that twenty-five consecutive miles of said road and telegraph line have been completed in a good, substantial and workmanlike manner, as in all other respects required by this act, the commissioners shall so report under oath to the President of the United States, and patents of lands, as aforesaid, shall be issued to said company, confirming to said company the right and title to said lands situated opposite to and coterminous with said completed section of said road. And from time to time, whenever twenty-five additional consecutive miles shall have been constructed, completed, and in readiness as aforesaid, and verified by said commissioners to the President of the United States, then patents shall be issued to said company conveying the additional sections of land as aforesaid, and so on as fast as every twenty-five miles of said road is completed as aforesaid."

As recited in the foregoing act of Congress, the Southern Pacific Railroad Company was a corporation of the state of California, and by its charter was authorized to build a railroad "from some point on the Bay of San Francisco, in the state of California, through the counties of Santa Clara, Monterey, San Luis Obispo, Tulare, Los Angeles and San Diego to the eastern line of said state of California, there to connect with a contemplated railroad from said eastern line of the state of California to the Mississippi river."

The act of 1866, as has been seen, authorized the Southern Pacific Railroad Company to connect with the Atlantic & Pacific Railroad "at such point, near the boundary line of the state of California, as they shall deem most suitable for a railroad line to San Francisco." That company undertook to lay out a different route from that designated in its articles of incorporation, and on the 3d day of January, 1867, filed with the Commissioner of the General Land Office a map showing the line of route so adopted by the company, and on the 4th of the succeeding month the then Secretary of the Interior directed the Commissioner of the General Land Office to cause to be withdrawn from sale or disposal the odd sections within the granted limits of 20 miles on each side of the road, as shown on the map so filed January

3, 1867, and also the odd sections outside of the 20 miles and within 30 miles on each side of the said route, from which indemnity for land otherwise disposed of by the government within the granted limits should be taken. July 14, 1868, the said order of withdrawal was revoked, and the lands included therein were opened to sale. On the 20th of August following the latter order was suspended, so far as it related to lands south of San Jose, Cal., and November 2 and 11, 1869, the then Secretary of the Interior revoked the suspension of August 20, 1868, and directed the restoration to sale, after 60 days' notice, of the lands included in the suspension order. On the 15th of the next month the orders of November 2d and 11th, made the preceding month, were suspended. Opinions of Attorney General, Vol. 16, pp. 80–89. July 25, 1868, the time for the construction of the road by the Southern Pacific Railroad Company was extended by Congress (Act July 25, 1868, c. 242, 15 Stat. 187), and on June 28, 1870, Congress passed the joint resolution in question, which is here set out in full:

"Be it resolved by the Senate and House of Representatives of the United States of America in Congress assembled, that the Southern Pacific Railroad Company of California may construct its road and telegraph line, as near as may be, on the route indicated by the map filed by said company in the Department of the Interior on the third day of January, eighteen hundred and sixty-seven; and upon the construction of each section of said road, in the manner and within the time provided by law, and notice thereof being given by the company to the Secretary of the Interior, he shall direct an examination of each such section by commissioners to be appointed by the President, as provided in the act making a grant of land to said company, approved July twenty-seventh, eighteen hundred and sixty-six, and upon the report of the commissioners to the Secretary of the Interior that such section of said railroad and telegraph line has been constructed as required by law, it shall be the duty of the said Secretary of the Interior to cause patents to be issued to said company for the sections of land coterminous to each constructed section reported on as aforesaid, to the extent and amount granted to said company by the said act of July twenty-seventh, eighteen hundred and sixty-six, expressly saving and reserving all the rights of actual settlers, together with the other conditions and restrictions provided for in the third section of said act."

In their brief counsel for the complainants ask the court to "account for, explain, construe, interpret, and apply" the foregoing saving clause. The reason for and purpose of it is quite fully set forth in the debate in the Senate upon the resolution, where it was first introduced (Congressional Record, part V, 2d Session, 41st Congress 1869–1870, pp. 3950, 3951, 3952, 3953).

[2] While asking the court to account for and explain the clause, counsel at the same time assert that the court is not at liberty to refer to the debate in the Senate upon the subject. It is quite true that the meaning of the clause is to be determined from the language used by Congress, but counsel are mistaken in supposing and asserting it to be improper for the court to refer to the debate. In Binns v. United States, 194 U. S. 486, 495, 24 Sup. Ct. 816, 819 (48 L. Ed. 1087), the Supreme Court said:

"While it is generally true that debates in Congress are not appropriate sources of information from which to discover the meaning of the language of a statute passed by that body (United States v. Freight Association, 166 U. S. 290, 318 [17 Sup. Ct. 540, 41 L. Ed. 1007]), yet it is also true that we

have examined the reports of the committees of either body with a view of determining the scope of statutes passed on the strength of such reports (Holy Trinity Church v. United States, 143 U. S. 457, 464 [12 Sup. Ct. 511, 36 L. Ed. 226]). When sections 461 and 462 were under consideration in the Senate, the chairman of the committee on territories, in response to inquiries from senators, made these replies: 'The committee on territories have thoroughly investigated the condition of affairs in Alaska and have prepared certain licenses which in their judgment will create a revenue sufficient to defray all the expenses of the government of the territory of Alaska. * * * They are licenses peculiar to the condition of affairs in the territory of Alaska on certain lines of goods, articles of commerce, etc., which, in the judgment of the committee, should bear a license, inasmuch as there is no taxation whatever in Alaska. Not one dollar of taxes is raised on any kind of property there.' It is therefore necessary to raise revenue of some kind, and in the judgment of the committee on territories, after consultation with prominent citizens of the territory of Alaska, including the governor and several other officers, this code or list of licenses was prepared by the committee. It was prepared largely upon their suggestions and upon the information of the committee derived from conversing with them.' Vol. 32, Congressional Record, part III, p. 2235."

In Jennison v. Kirk, 98 U. S. 453, 459, 25 L. Ed. 240, the same court, in construing an act of Congress and in referring to and setting forth certain statements of one of the senators made in the Senate, said:

"These statements of the author of the act in advocating its adoption cannot, of course, control its construction, where there is doubt as to its meaning; but they show the condition of mining property on the public lands of the United States, and the tenure by which it was held by miners in the absence of legislation on the subject, and thus serve to indicate the probable intention of Congress in the passage of the act."

In the case of People v. Stephens, 62 Cal. 209, 235, 236, the Supreme Court of California, in construing one of the provisions of the Constitution of the state, referred to the purpose of the provision as explained in the debates in the constitutional convention by the member at whose instance it was inserted and became a part of the Constitution. See, also, Wadsworth v. Boysen, 148 Fed. 771, 778, 78 C. C. A. 437; Ho Ah Kow v. Nunan, Fed. Cas. No. 6,546.

Turning to the debate in the Senate upon the saving clause added to the joint resolution of June 28, 1870, it is readily seen that its purpose was to protect those settlers who had located upon public lands along the line of the proposed changed route of the Southern Pacific Railroad Company, as indicated by the map filed by that company in the General Land Office on the 3d of January, 1867. By the joint resolution Congress sanctioned the change of route and made to the Southern Pacific Railroad Company a precisely similar grant of land on each side of that line that it had made to the same company by the 18th section of the act of July 27, 1866, on each side of the line of road therein authorized; but to protect not only those who had acquired or might acquire prior to the attaching of the grant a legal right to lands along the line of the changed route, but also all actual settlers thereon, Congress provided in and by the joint resolution that the change of route thereby authorized and the grant of lands thereby made should not affect the rights of any actual settler, and, further, that the grant of lands thereby made to the Southern Pacific Railroad

Company along the new route was and should be subject to the same conditions and restrictions as applied to the original grant made to that company in and by the act of July 27, 1866—the language of the joint resolution being, as has been seen:

"Expressly saving and reserving all the rights of actual settlers, together with the other conditions and restrictions provided for in the third section of said act."

Those conditions and restrictions are specifically stated in the act of 1866, and are, in substance, that the grant should not apply to any mineral land nor to any land reserved, sold, granted, or otherwise appropriated, nor to any land to which the United States did not have full title, and which was not free from pre-emption or other claims or right at the time the line of the road should be designated by a plat thereof filed in the office of the Commissioner of the General Land Office. Such are the express provisions of the grant of July 27, 1866, expressly referred to in the joint resolution for the conditions and restrictions of the grant of the lands thereby made along the line of road thereby authorized to be built.

[3] There is absolutely nothing in the saving clause of the joint resolution in my opinion either requiring or authorizing the patents thereby directed to be issued for the granted lands to contain those conditions or restrictions or any of them. If such patents were thereby required or authorized to contain one of the conditions or restrictions, then manifestly they were required to contain all of them, for no distinction is made between them by Congress and none can be found in the language of its acts in question. Clearly, therefore, if the contention of the complainants' counsel is correct, that by the joint resolution of June 28, 1870, Congress required that the patents to be issued to the railroad company for lands within the grant made to it should contain an exception of all mineral lands, they were likewise required to contain a similar exception of all lands reserved, sold, granted, or otherwise appropriated, and all land to which the United States did not have full title and which was not free from pre-emption or other claims or rights at the time the line of the grantee's road was designated by a plat thereof filed in the office of the Commissioner of the General Land Office. There is no escape from this conclusion, for I repeat that the statute makes no distinction between the conditions and restrictions of the grant, save only the rights of actual settlers therein expressly specified, and no distinction in the other conditions and restrictions of this grant has been or can be suggested by counsel for the simple reason that the statute contains none. The result is that according to the contention of counsel for the complainants, we would have Congress providing for the issuance of government patents for lands under its grant which upon their face would leave open for all time, to be decided by courts or juries, as the case might be, not only the question as to the character of the land patented, but also as to whether it had been reserved, sold, granted, or otherwise appropriated, and as to whether the United States had full title, and whether it was free from pre-emption or other claims or rights at the time the railroad company designated

the line of its road by filing a plat thereof in the office of the Commissioner of the General Land Office. As a matter of course Congress never intended anything of the sort, and there is nothing in the acts in question nor in any other grant to any railroad company that has ever come under my observation, or in any decision of the Supreme Court, that gives any support to any such conclusion.

The patent was the last step in the proceedings provided for by Congress, and was designed, as the statute expressly declares, to convey the government title to the grantee. Of what avail would such an instrument, intended for the peace and security of the holder, be if the antecedent facts upon which it is required to be based are open to subsequent inquiry and contestation by strangers to the title? As well might it be contended that questions of fact in respect to the marking of the boundaries of a patented mining claim or the previous discovery of mineral therein, or any other fact made essential by the statute to the issuance of a mining patent, are open to inquiry by the courts subsequent to its issue. In respect to such a contention this court said in the case of Doe v. Waterloo Mining Co. (C. C.) 54 Fed. 935, 940:

"If the rights conferred by the patent can be defeated by showing a want of parallelism of the end lines in the original location, it is difficult to understand why the patent may not likewise be defeated by showing that the original location was void because its boundaries were not properly marked upon the ground, or because no vein, lode, or ledge was discovered within them, or because the statutory requirement in respect to the posting of the notice of location was not complied with, or because of an omission on the part of the locator to comply with any other provision of the statute regarding the location of such lode claims. All such matters I understand to be absolutely concluded by the patent so long as it stands unrevoked. If questions relating to the boundaries of the location, the marking of them, the discovery of a vein, lode, or ledge within them, the posting of the required notice, etc., are open to contestation after the issuance of a patent for the claim as before, the issuance of such an instrument would be a vain act, and would wholly fail to secure to the patentee the rights and privileges designed by the law authorizing its issue. The very purpose of the patent is to do away with the necessity of going back to the facts upon which it is based."

Great reliance is placed by counsel for the complainants on this clause from the opinion of the Supreme Court in the case of Barden v. Northern Pacific Railroad Co., 154 U. S. 288, 14 Sup. Ct. 1030, 38 L. Ed. 992:

"The delay of the government in issuing a patent to the plaintiff, of which great complaint is made, does not affect the power of the company to assert, in the meantime, by possessory action (as held in Deseret Salt Company v. Tarpey, 142 U. S. 241, 12 Sup. Ct. 158, 35 L. Ed. 999), its right to lands which are in fact nonmineral. But such delay, as well observed, cannot have the effect of entitling it to recover, as is contended in this case, lands which it admits to be mineral. The government cannot be reasonably expected to issue its patent, and it is not authorized to do so, without excepting mineral lands, until it has had an opportunity to have the country, or that part of it for which a patent is sought, sufficiently explored to justify its declaration in the patent, which would be taken as its determination, that no mineral lands exist therein."

The observation that "the government cannot be reasonably expected to issue its patent, and it is not authorized to do so, without ex-

cepting mineral lands, until it has had an opportunity to have the country, or that part of it for which a patent is sought sufficiently explored to justify its declaration in the patent," is very far from saying, much less deciding, that a patent issued for lands in pursuance of such a grant must or may except from the lands described in the granting clause thereof all mineral lands. The court could not have so decided in that case, for there was no such question before the court, and could not have been, as no patent had been issued in the case there under consideration. It was an action by the Northern Pacific Railroad Company to recover certain lands, confessedly mineral in character, as a part of its land grant, which grant, like the one here in question, excluded all mineral land therefrom, on the ground that, when that grant became attached to the various sections within it by the definite location of the company's line of road, the land in suit was not known to be mineral land; and the question in the case, as will be readily seen from the prevailing as well as the dissenting opinions, was whether that fact entitled the railroad company to the land sued for as part of its grant, or whether such land was excluded from the grant by the discovery of its mineral character at any time prior to the issuance of the government patent therefor. The majority of the court held that the character of the land was open to inquiry at any time prior to the issuance of the patent, and that the discovery of its mineral character at any time before it was patented necessarily excluded it from the grant, because the grant was of nonmineral land only.

[4] But the court in the prevailing opinion distinctly pointed out that the duty of ascertaining and determining the character of the land rested upon the officers of the Land Department, and there is, I think, nothing in it even tending to show that that or any other matter of fact could be left by them to the ascertainment and determination of a court or jury subsequent to the issuance of the government patent. The court said:

"The law places under the supervision of the Interior Department and its subordinate officers, acting under its direction, the control of all matters affecting the disposition of public lands of the United States, and the adjustment of private claims to them under the legislation of Congress. It can hear contestants and decide upon the respective merits of their claims. It can investigate and settle the contentions of all persons with respect to such claims. It can hear evidence upon and determine the character of lands to which different parties assert a right; and, when the controversy before it is fully considered and ended, it can issue to the rightful claimant the patent provided by law, specifying that the lands are of the character for which a patent is authorized. It can thus determine whether the lands called for are swamp lands, timber lands, argicultural lands, or mineral lands, and so designate them in the patent which it issues. The act of Congress making the grant to the plaintiff provides for the issue of a patent to the grantee for the land claimed, and, as the grant excludes mineral lands in the direction for such patent to issue, the Land Office can examine into the character of the lands, and designate it in its conveyance.

"It is the established doctrine, expressed in numerous decisions of this court, that wherever Congress has provided for the disposition of any portion of the public lands of a particular character, and authorizes the officers of the Land Department to issue a patent for such land upon ascertainment of certain facts, that department has jurisdiction to inquire into and determine as to the existence of such facts, and, in the absence of fraud, imposition, or mistake, its determination is conclusive against collateral attack.

"In Smelting Co. v. Kemp, 104 U. S. 636, 640, 641, 26 L. Ed. 875, this court thus spoke of the Land Department in the transfer of public lands: 'The patent of the United States is the conveyance by which the nation passes its title to portions of the public domain. For the transfer of that title the law has made numerous provisions, designating the persons who may acquire it and the terms of its acquisition. That the provisions may be properly carried out, the Land Department, as part of the administrative and executive branch of the government, has been created to supervise all the various proceedings taken to obtain title from their commencement to their close. In the course of their duty, the officers of that department are constantly called upon to hear testimony as to matters presented for their consideration and to pass upon its competency, credibility, and weight. In that respect they exercise a judicial function, and therefore it has been held in various instances by this court that their judgment as to matters of fact properly determinable by them is conclusive when brought to notice in a collateral proceeding. Their judgment in such cases is like that of other special tribunals upon matters within their exclusive jurisdiction, unassailable except by a direct proceeding for its correction or annulment. The execution and record of the patent are the final acts of the officers of the government for the transfer of its title, and, as they can be lawfully performed only after certain steps have been taken, that instrument, duly signed, countersigned, and sealed, not merely operates to pass the title, but is in the nature of an official declaration by that branch of the government to which the alienation of the public lands, under the law, is intrusted, that all the requirements preliminary to its issue have been complied with. The presumptions thus attending it are not open to rebuttal in an action of law.'

"In Steele v. Smelting Co., 106 U. S. 447, 450 [1 Sup. Ct. 389, 392, 27 L. Ed. 226], the language of the court was that: 'The Land Department, as we have repeatedly said, was established to supervise various proceedings whereby a conveyance of the title from the United States to portions of the public domain is obtained, and to see that the requirements of different acts of Congress are fully complied with. Necessarily, therefore, it must consider and pass upon the qualification of the applicant, the acts he has performed to secure the title, the nature of the land, and whether it is of the class which is open to sale. Its judgment upon these matters is that of a special tribunal, and is unassailable except by direct proceedings for its annulment or limitation.'

"In Heath v. Wallace, 138 U. S. 573, 585 [11 Sup. Ct. 380, 384, 34 L. Ed. 1053], it was held that 'the question whether or not lands returned as "subject to periodical overflow" are "swamp and overflowed lands" is a question of fact properly determinable by the Land Department.' And Mr. Justice Lamar added: 'It is settled by an unbroken line of decisions of this court in land jurisprudence that the decisions of that department upon matters of fact within its jurisdiction are, in the absence of fraud or imposition, conclusive and binding on the courts of the country.' If the Land Department must decide what lands shall not be patented because reserved, sold, granted, or otherwise appropriated, or because not free from pre-emption or other claims or rights at the time the line of the road is definitely fixed, it must also decide whether lands are excepted because they are mineral lands. It has always exercised this jurisdiction in patenting lands which were alleged to be mineral or in refusing to patent them because the evidence was insufficient to show that they contained minerals in such quantities as to justify the issue of the patent. If, as suggested by counsel, when the Secretary of the Interior has under consideration a list of lands to be patented to the Northern Pacific Railroad Company, it is shown that part of said lands contain minerals of gold and silver, discovered since the company's location of its road opposite thereto, he would not perform his duty, stated in Knight v. Land Association, 142 U. S. 161, 178 [12 Sup. Ct. 258, 35 L. Ed. 974], as the 'supervising agent of the government to do justice to all claims and preserve the rights of the people of the United States,' by certifying the list until corrected in accordance with the discoveries made known to the department. He would not otherwise discharge the trust reposed in him in the administration of the law respecting the public domain.

"There are undoubtedly many cases arising before the Land Department in the disposition of the public lands where it will be a matter of much difficulty on the part of its officers to ascertain with accuracy whether the lands to be disposed of are to be deemed mineral lands or agricultural lands, and in such cases the rule adopted that they will be considered mineral or agricultural as they are more valuable in the one class or the other may be sound. The officers will be governed by the knowledge of the lands obtained at the time as to their real character. The determination of the fact by those officers that they are one or the other will be considered as conclusive.

"In the case of Central Pacific Railroad Company v. Valentine, 11 Land Dec. Dep. Int. 238, 246, the late Secretary of the Interior, Mr. Noble, speaks of the practice of the Land Department in issuing patents to railroad lands. His language is: 'The very fact, if it be true, that the office of the patent is to define and identify the land granted, and to evidence the title which vested by the act, necessarily implies that there exists jurisdiction in some tribunal to ascertain and determine what lands were subject to the grant and capable of passing thereunder. Now, this jurisdiction is in the Land Department, and it continues, as we have seen, until the lands have been either patented or certified to or for the use of the railroad company. By reason of this jurisdiction, it has been the practice of that department for many years past to refuse to issue patents to railroad companies for lands found to be mineral in character at any time before the date of patent. Moreover, I am informed by the officers in charge of the mineral division of the Land Department that ever since the year 1867 (the date when that division was organized) it has been the uniform practice to allow and maintain mineral locations within the geographical limits of railroad grants, based upon discoveries made at any time before patent or certification where patent is not required. This practice having been uniformly followed and generally accepted for so long a time, there should be, in my judgment, the clearest evidence of error as well as the strongest reasons of policy and justice controlling before a departure from it should be sanctioned. It has, in effect, become a rule of property.'

"It is true that the patent has been issued in many instances without the investigation and consideration which the public interest requires; but if that has been done without fraud, though unadvisedly by officers of the government charged with the duty of supervising and attending to the preparation and issue of such patents, the consequence must be borne by the government until by further legislation a stricter regard to their duties in that respect can be enforced upon them. The fact remains that under the law the duty of determining the character of the lands granted by Congress, and stating it in instruments transferring the title of the government to the grantees, reposes in officers of the Land Department. Until such patent is issued, defining the character of the land granted and showing that it is nonmineral, it will not comply with the act of Congress in which the grant before us was made to plaintiff. The grant, even when all the acts required of the grantees are performed, only passes a title to nonmineral lands; but a patent issued in proper form, upon a judgment rendered after a due examination of the subject by officers of the Land Department, charged with its preparation and issue, that the lands were nonmineral, would, unless set aside and annulled by direct proceedings, estop the government from contending to the contrary, and, as we have already said, in the absence of fraud in the officers of the department, would be conclusive in subsequent proceedings respecting the title."

I do not find in this language of the prevailing opinion in the Barden Case any support for the contention of the complainants' counsel that the officers of the Land Department were required or authorized to insert in the patents here in question, or in any other similar patent, after describing the lands falling within the railroad grant, a clause "excluding and excepting all mineral lands, should any such be found in the tracts aforesaid." And that the Supreme Court itself takes the

same view of the decision in the Barden Case is, I think, shown by its reference thereto in the case of Shaw v. Kellogg, 170 U. S. 313, 339, 18 Sup. Ct. 632, 643 [42 L. Ed. 1050], where it says:

"Defendant relies largely on the decision of this court in Barden v. Northern Pacific Railroad, 154 U. S. 288 [14 Sup. Ct. 1030, 38 L. Ed. 992], in which it was held that lands identified by the filing of the map of definite location as within the scope of the grant made by Congress to that company, although at the time of the filing of such map not known to contain any mineral, did not pass under the grant if before the issue of the patent mineral was discovered. But that case, properly considered, sustains rather the contentions of the plaintiff. It is true there was a division of opinion, but that division was only as to the time at which and the means by which the nonmineral character of the land was settled. The minority were of the opinion that the question was settled at the time of the filing of the map of definite location. The majority, relying on the language in the original act of 1864 making the grant, and also on the joint resolution of January 30, 1865, which expressly declared that such grant should not be 'construed as to embrace mineral lands, which in all cases shall be and are reserved exclusively to the United States,' held that the question of mineral or nonmineral was open to consideration up to the time of issuing a patent. But there was no division of opinion as to the question that when the legal title did pass—and it passed unquestionably by the patent—it passed free from the contingency of future discovery of minerals."

I am also of the opinion that the case last referred to—Shaw v. Kellogg—is direct authority for the proposition that the officers of the Land Department had no authority to insert in the patents under consideration the clause excepting from the lands described in its granting clause "all mineral lands, should any such be found in the tracts aforesaid." The grant involved in Shaw v. Kellogg was made by section 6 of an act of Congress passed June 21, 1860 (12 Stat. 71, c. 167), in settlement of a claim under a Mexican grant to land in the vicinity of Los Vegas by which the claimants were given an equal amount of nonmineral and vacant land to be by them elsewhere selected in the territory of New Mexico, to be located in a certain form and within a certain time. It was by the act made the duty of the Surveyor General of New Mexico to make survey and location of the land so selected. The grantees made their selection and applied for the land. Certain correspondence occurred between the Land Department and the Surveyor General in respect to the form of the application and in respect to the evidence relating to the character of the land; that is to say, whether or not it was mineral land, which resulted in the Land Department instructing the Surveyor General to approve the selection and make a survey thereof. The Land Department subsequently approved the survey, field notes, and plat of the Surveyor General, but in doing so added the words, "Subject to the conditions and provisions of section 6 of the act of Congress approved June 21, 1860," which, as has been seen, excluded mineral land from the grant. The act of Congress did not provide for the issuance of a patent, but the Land Department noted on its maps that this tract had been segregated from the public domain and had become private property and so reported to Congress, which never questioned the validity of such action. The grantees were also notified and took possession of the land. Many years afterwards a portion of it was claimed as mineral land by a

186 F.—60

party whose contentions were thus stated by the Supreme Court in its opinion:

"These contentions are that Congress granted only nonmineral lands; that this particular tract is mineral land, and therefore by the terms of the act is not within the grant; that no patent has ever been issued, and therefore the legal title has never passed from the government; that the Land Department never adjudicated that this was nonmineral land, but, on the contrary, simply approved the location, subject to the conditions and provisions of the act of Congress, thereby leaving the question of title to rest in perpetual abeyance upon possible future discoveries of mineral within the tract."

In considering the limitation undertaken to be imposed by the Land Department upon its approval of the selection of the land by the grantees and the Surveyor General's survey, field notes, and plat thereof, the Supreme Court said:

"What is the significance of and what effect can be given to the clause inserted in the certificate of approval of the plat that it was subject to the conditions and provisions of the act of Congress? We are of the opinion that the insertion of any such stipulation and limitation was beyond the power of the Land Department. Its duty was to decide, and not to decline to decide; to execute, and not to refuse to execute the will of Congress. It could not deal with the land as an owner and prescribe the conditions upon which title might be transferred. It was agent, and not principal. Congress had made a grant, authorized a selection within three years, and directed the Surveyor General to make survey and location, and within the general powers of the Land Department it was its duty to see that such grant was carried into effect, and that a full title to the proper land was made. Undoubtedly it could refuse to approve a location on the ground that the land was mineral. It was its duty to decide the question—a duty which it could not avoid or evade. It could not say to the locator that it approved the location provided no mineral should ever thereafter be discovered, and disapproved it if mineral were discovered; in other words, that the locator must take the chances of future discovery of minerals. It was a question for its action and its action at the time. The general statutes of Congress in respect to homestead, pre-emption, and town-site locations provide that they shall be made upon lands that are nonmineral; and in approving any such entry and issuing a patent therefor could it be tolerated for a moment that the Land Department might limit the grant and qualify the title by a stipulation that if thereafter mineral should be discovered the title should fail? It cannot in that way avoid the responsibility of deciding and giving to the party seeking to make the entry a full title to the land or else denying it altogether. As said in Deffeback v. Hawke, 115 U. S. 406 [6 Sup. Ct. 101, 29 L. Ed. 423]: 'The position that the patent to the plaintiff should have contained a reservation excluding from its operation all building and improvements not belonging to him, and all rights necessary or proper to the possession and enjoyment of the same, has no support in any legislation of Congress. The land officers, who are merely agents of the law, had no authority to insert in the patent any other terms than those of conveyance, with recitals showing a compliance with the law and the conditions which it prescribed.'"

It results from what has been said that the demurrers must be, and are, sustained, and the bills dismissed, at the complainants' cost.