EASTERN OREGON LAND CO. v. WILLOW RIVER LAND &
IRRIGATION CO.

(Circuit Court of Appeals, Ninth Circuit. November 1, 1912.)

No. 2,007.

1. INJUNCTION (§ 36*)—SUIT TO RESTRAIN TRESPASS—EQUITY JURISDICTION—
DISPUTED TITLE.
In a suit to enjoin the building of a dam and the impounding of water
from a stream by defendant on land to which complainant claims title
through a grant by Congress of agricultural lands and a patent issued
thereunder, defendant cannot raise a question of title which will defeat
jurisdiction of a court of equity by alleging that the land is mineral,
and did not therefore pass under the grant or patent to complainant,
where it makes no claim of title in itself, and is seeking to appropriate
the land for agricultural, and not mineral, purposes.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 82–84; Dec.
Dig. § 36.*]

2. INJUNCTION (§ 36*)—GROUNDS OF RELIEF—TRESPASS.
A court of equity has jurisdiction to enjoin a trespass, even when the
title to the premises is in dispute, where the trespass is of such nature
as to destroy the substance of the estate in the character in which it is
claimed by complainant, and will work irreparable damage to him if his
right should be established.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 82–84; Dec.
Dig. § 36.*]

3. INJUNCTION (§ 113*)—ACTION—LACHES.
A suit to enjoin a trespass on real estate is not barred by laches, where
complainant notified defendant of its rights and that it would protect
the same at once on learning of defendant's proposed action, and com-
menced suit within six months thereafter.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 198–201;
Dec. Dig. § 113.*]

4. WATERS AND WATER COURSES (§ 40*)—RIPARIAN RIGHTS IN STREAM—ORE-
GON STATUTES—OVERFLOW WATERS.
A riparian owner of land on a stream in Oregon, a part of which is
irrigated by the overflow water each spring and produces annual crops of
grass, used by him for pasturage and hay, and which land, without such
irrigation, would be valueless for practical use, has a vested right in such
water, of which he cannot be deprived by another above him by an appro-
priation made under the state statutes (L. O. L. § 6525 et seq., or Act Feb.
24, 1909 [Laws 1909, p. 319]), both of which, while authorizing such ap-
propriation, provide that no owner of lands on a stream shall thereby
be deprived of vested rights acquired by the prior and continued actual
application of water from such stream to beneficial use.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig.
§ 32; Dec. Dig. § 40.*]

5. WATERS AND WATER COURSES (§ 40*)—"NATURAL FLOW OF STREAM"—OVER-
FLOW WATERS.
The increased flow of a stream, occurring annually by reason of rainfall
and melting snow about its source, is no less the "natural flow of the
stream" because it does not remain within the ordinary channel, but over-
flows adjacent low grounds without well-defined banks, so long as it re-

mains a single body of water and is eventually discharged through the proper channel.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 32; Dec. Dig. § 40.*

For other definitions, see Words and Phrases, vol. 5, pp. 4666, 4667.]

Gilbert, Circuit Judge, dissenting.

Appeal from the Circuit (District) Court of the United States for the District of Oregon; Robert S. Bean, Judge.

Suit in equity by the Eastern Oregon Land Company against the Willow River Land & Irrigation Company. Decree for defendant (187 Fed. 466), and complainant appeals. Reversed.

Suit for an injunction to restrain appellee, the Willow River Land & Irrigation Company, from constructing a dam for a reservoir in the canyon of Willow creek, in Malheur county, Or., upon lands claimed by the appellant, from flooding certain adjoining lands of appellant with the waters of such reservoir, and from appropriating, diverting, or taking from the channel of Willow creek any of the waters naturally flowing through lands riparian to said creek and owned by the appellant.

Teal, Minor & Winfree and Huntington & Wilson, all of Portland, Or., for appellant.

Richards & Haga, of Boise City, Idaho, for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge. The appellant was the complainant, and the appellee the defendant, in the court below, and the parties will be so designated in this opinion.

The complainant is a California corporation, which has succeeded to the title and claims to be the owner in fee of all the lands granted to the state of Oregon by the act of Congress entitled "An act granting lands to the state of Oregon to aid in the construction of a military wagon road from Dalles City, on the Columbia river, to Ft. Boise, on the Snake river," approved February 25, 1867 (14 Stat. L. 409, c. 77), known as "The Dalles Military Road Grant." The Dalles Military Road grant extends across the northern end of Malheur county, in the state of Oregon, and includes the odd-numbered sections to the extent of three sections in width on each side of the line of road. Willow creek is a nonnavigable stream flowing in a general southeasterly direction through the northern portion of Malheur county, and is a tributary to the Malheur river.

It is alleged in the bill of complainant that the channel of Willow creek crosses or intersects a portion of the following sectional tracts included in The Dalles Military Road grant, now claimed as belonging to the complainant: In township 14 S., range 42 E.: The S. ½ of S. W. ¼ and the S. W. ¼ of S. E. ¼ of section 21, containing 120 acres, and section 27, containing 640 acres. In township 15 S., range 42 E.: Sections 3 and 11, containing 1,280 acres. In township 15 S., range 43 E.: The N. ½, the S. E. ¼, the N. ½ of S. W. ¼, and S. E. ¼ of S. W. ¼ of section 31, containing 600 acres. In township

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

16 S., range 43 E.: The N. ½, the S. E. ¼, and the N. E. ¼ of S. W. ¼ of section 5, containing 520 acres; the N. W. ¼ and the E. ½ of S. W. ¼ of section 9, containing 240 acres; the S. ½, the S. ½ of N. ½, and the N. W. ¼ of the N. W. ¼ of section 23, containing 520 acres; and section 25 in same township, containing 640 acres. In township 16 S., range 44 E.: The W. ½ and the S. E. ¼ of section 31, containing 480 acres. In township 17 S., range 44 E.: The W. ½, the W. ½ of S. E. ¼, and the S. E. ¼ of S. E. ¼ of section 5, containing 440 acres; sections 9 and 15, containing 1,280 acres; the W. ½ and S. E. ¼ of section 23, containing 480 acres; and section 25, containing 640 acres.

It is alleged that the foregoing sectional tracts, amounting in the aggregate to 7,880 acres, are riparian to Willow creek. Willow creek, from the point where it enters section 21 in township 14 S., range 42 E., down to a point near the northwest corner of section 14, township 15 S., range 42 E., a distance of about 10 miles, flows through a rocky canyon, with bluffs, or steep, high hills, on each side. From the northwest corner of said section 14, township 15 S., range 42 E., the creek enters a wide valley, the lower level of which is from three-quarters of a mile to a mile and a half wide. On the southerly side of the creek the lower level or bottom lands are separated from the foothills by a distinct bench formation a mile or two miles in width, while on the northerly side of the creek the bottom lands slope gradually to the foothills. The bottom lands, in so far as they are subject to annual overflow or are artificially irrigated, produce wild grass and other hay crops. The valley lands, not so irrigated, are arid and unproductive. The channel of the creek, after it enters the valley, is not of sufficient capacity to carry all of the water of the creek during periods of high water, which usually occur in the latter part of winter or early spring, and the lower levels of the valley are consequently subjected to overflow to a greater or less extent. About 3,600 acres of the complainant's land lie in this lower level on both sides of the creek, and about 300 acres are rendered productive of wild grass and other hay crops by the annual overflow.

With the exception of the title to the lands in sections 21 and 27 in township 14 S., range 42 E., there is no serious controversy as to the title to the lands along Willow creek described in the bill of complaint and claimed by the complainant. It is practically conceded that the title to such lands passed from the United States to the state of Oregon by the terms of the grant contained in the act of Congress of February 25, 1867 (14 Stat. 409, c. 77), and the act of June 18, 1874 (18 Stat. 80, c. 305 [U. S. Comp. St. 1901, p. 1517]), and that by mesne conveyances the title to the said lands has become vested in the complainant; nor is there any controversy that the granting act, is by its terms, a grant in præsenti, and that the riparian rights appurtenant to the lands were not reserved or otherwise disposed of by the United States, but passed with the title of the land to the state of Oregon and to its grantees. With respect to the title of sections 21 and 27 in township 14 S., range 42 E., the question is presented whether these lands are within the terms of the grant. They are

within the primary limits of the grant, and patents were issued therefor by the United States to The Dalles Military Road Company, and the title, if any passed by grant or patent, has become vested in the complainant. But it is objected on the part of the defendant that the title to mineral land did not pass by either grant or patent, and that the lands in these two sections are mineral lands.

It is alleged in the bill of complaint that the defendant, without the authority or consent of the complainant, has wrongfully and unlawfully entered upon the W. ½ of the S. W. ¼ of section 27, township 14 S., range 42 E., and has commenced the construction of a dam, the dimensions of which would be about 337 yards in length and 100 feet in height; that this dam would be constructed for the purpose of obstructing the flow of water in the natural channel of Willow creek, and to create a large reservoir for the storage and retention of waters flowing in Willow creek above said dam, and by means of said dam, it is alleged, defendant intended to and would flood and overflow portions of sections 21 and 27, owned by the complainant, and would divert the waters of Willow creek at and below said dam to nonriparian lands owned by the defendant, and would thereby deprive the complainant of the right to use the waters of Willow creek flowing through its riparian lands, thereby greatly injuring and depreciating the value of said riparian lands, to the irreparable injury and damage of the complainant.

In defendant's answer it is alleged that the lands claimed by the defendant in sections 21 and 27, township 14 S., range 42 E., are mineral lands. It denies that the complainant is the owner of said lands, but admits that defendant proposes to construct a dam of practically the dimensions mentioned in the bill of complaint; that it is the defendant's purpose in the construction of said dam to obstruct the flow of a part of the water in the natural channel of Willow creek, viz., the surplus of flood water thereof; that it will create a large reservoir for the storage and retention of said water, and that by the retention of said water in said reservoir will overflow and flood a small portion of the W. ½ of the S. W. ¼ of section 27, and a small portion of the S. ½ of the S. W. ¼ and the S. W. ¼ of the S. E. ¼ of section 21; but it denies that the construction and maintenance of said dam or the overflow on said land will greatly or irreparably damage complainant, or will cause it any damage whatever. It is alleged that not to exceed 50 acres of said lands will be affected in any way by the construction or maintenance of said dam and reservoir.

Defendant admits that it is its purpose in the construction of said dam and the maintenance thereof, and of the reservoir created thereby, to divert certain of the waters of Willow creek from its natural channel and by means of ditches to convey the same to its own lands and to the lands of other people, a part of which said lands are riparian to Willow creek, and part of same are not. Defendant alleges that its purpose in the construction and maintenance of said dam and reservoir is to create and impound in said reservoir the flood or surplus water of said creek, which as it naturally flows is of no use whatever to said complainant, or to any other person; and its purpose is to use said

water so collected and impounded in the proper and necessary irrigation of adjacent arid land belonging to itself and other parties.

With respect to the ownership of sections 27 and 21, in township 14, range 42 E., the defendant alleges that said land, and particularly that part thereof occupied by said dam and to be occupied by its reservoir, is mining land, and that the same is more valuable for its gold deposits than for any other purpose, and that it is and always has been absolutely valueless for any other purpose, except that of mining for gold; alleges that more than 30 years ago said land was filed upon as placer gold mining claims by the predecessors in interest of the defendant, under and pursuant to the laws of the United States governing the acquiring of placer gold mining claims; that the persons who so filed upon said land as such mining claims held, worked, and occupied the same as mining claims, and that by proper mesne conveyances from said parties said land has been conveyed to the defendant and it was the owner thereof; that defendant's predecessors in interest in said mining claims, for the purpose of working said mining claims, appropriated and used all the waters of Willow creek naturally flowing through said lands during the summer and autumn seasons, and used that quantity of water of said stream during the entire year in and about the working of said claims; that through various sales, transfers, and conveyances of said water rights the same have been sold, transferred, and conveyed to the defendant, and the defendant is the legal owner and holder of said water rights; alleges the incorporation of the defendant under and pursuant to the laws of the state of Oregon for the purpose, among other things, of constructing, maintaining, and operating dams, reservoirs, irrigation ditches, channels, and flumes, together with laterals running therefrom, for the purpose of irrigating lands, and for the purpose of bringing under cultivation desert and unproductive lands; to operate and construct irrigation systems, and the business of furnishing water for irrigation purposes to others under contract of sale, or in any other manner whatsoever; to acquire, build, or operate the business of a power company for itself or for furnishing power to others; to obtain, by purchase, lease, location, or otherwise, water rights and privileges and irrigation rights and privileges, and to maintain and operate a general system of irrigating lands for itself or for others, and to engage in the general business of developing and cultivating lands and handling the produce therefrom for itself or for others; to construct, maintain, improve, control, and superintend canals, reservoirs, water courses, flumes, ditches, and laterals.

It is alleged that, in furtherance of defendant's purpose and in pursuance of the statute of the state of Oregon, the defendant had on the 7th day of April, 1908, duly and regularly posted in conspicuous places at the point of its headgate of the reservoir situated in the N. E. ¼ of the S. W. ¼ of section 2, township 15 S., range 42 E., a notice of location and appropriation of the water of Willow creek. It is also alleged that said notice was on the same day posted in a conspicuous place at the headgate of the reservoir situated in the S. W. ¼ of the N. W. ¼ of section 27, township 14 S., range 42 E., and said notice was thereafter filed and recorded in the clerk's

office of Malheur county, Or. The notice is in substance that the defendant had located and appropriated 20,000 cubic inches of water by miner's measure, under 6-inch pressure, of and from Willow creek, and of and from the water flowing therein, or a sufficient amount thereof to maintain a continuous flow of 20,000 inches thereof, miner's measure; that there would be two reservoirs used for storage purposes in connection with the operation of said canal and the various laterals therefrom; that the headgate of the upper reservoir was to be constructed in the S. W. ¼ of the N. W. ¼ of section 27, township 14 S., range 42 E.; that the headgate of the lower reservoir was to be constructed in the N. E. ¼ of the S. W. ¼ of section 2, township 15 S., range 42 E. The general course and direction of the canal from said headgate in a southwesterly direction through sections 2 and 11 in township 15 S., range 42 E., is given through various numbered sections down to section 16 S., range 43 E., the size of the canal is stated, and that the water is located and appropriated for the purpose of beneficial use, and to be used and appropriated for the purpose of irrigation for household, domestic, and power purposes, for watering cattle and live stock. It is further alleged in the answer that defendant had filed for record in the office of the clerk of Malheur county a map showing the general route of the ditches and canals through and by means of which the water so appropriated in and pursuant to said notice was to be distributed and used in compliance with the statute of Oregon.

It is alleged that defendant has since proceeded with the construction of its dam and reservoir for the purposes stated; that complainant had known of the construction of the dam, and the labor and expense incident thereto, and had made no objection to the construction of said dam so far as the same might affect the flow of the water of Willow creek; and that defendant had expended more than $50,000 in the construction of said dam.

Upon the issues presented by the bill of complaint and answer, testimony was taken, and, upon being submitted to the Circuit Court, an order was entered denying the relief prayed for, and dismissing the bill, for two reasons: (1) That the title to the land upon which defendant was constructing its dam and reservoir was in dispute, and this dispute should be settled by law; (2) the complainant had not shown that it would be substantially injured by the impounding of the flood or waste waters of the stream. Both of these questions are involved in this appeal.

The objection that the title to the land upon which the defendant was constructing its dam and reservoir was in dispute presents two questions, one of law and the other of fact. The dam is located partly on section 28, and partly on section 27, township 14 S., range 42 E., but mainly on section 27, on the N. W. ¼ of the S. W. ¼ of that section. The complainant has no interest in the land in section 28. The location of one end of the dam upon that section is, therefore, of no interest to the complainant, and is not involved in this suit. The complainant holds a title to section 27 derived from a patent issued by the United States to The Dalles

Military Road Company on the 28th day of May, 1902; and it is contended on behalf of the complainant that the title to the land described in the patent passed to the grantee by proper conveyance and is now vested in the complainant, and that the character of the land is not now open to inquiry, unless it should be made to appear in a proper action that the patent had been procured by fraudulent misrepresentation on the part of the grantee as to the character of the land. No such claim of fraudulent misrepresentation is made in this case, but it is insisted that the grant did not embrace mineral lands, and that the officers of the Land Department had no authority to issue a patent for lands containing mineral, and that such lands were excluded by the terms of the patent.

The patent conveys in township 14 S., range 42 E., certain designated subdivisions of section 21, containing 120 acres, and "all of section 27, containing 640 acres," but provides, "yet excluding and excepting all mineral lands, should any such be found in the tracts aforesaid." It was contended by the complainant in the court below, and the contention is renewed here, that the issuance of the patent by the government of the United States to complainant's predecessor in interest was a conclusive adjudication that the lands described in the patent were nonmineral. It was admitted by the court that this probably was true if the patent contained no reservation; but it was the opinion of the court that the reservation manifested an unmistakable intention on the part of the government not to convey mineral lands, and repelled any inference that the department had adjudicated or intended to adjudicate that no part of the land described in the patent was mineral.

The complainant contends that the issuance of the patent was a final adjudication, by the only authority having jurisdiction to make the adjudication, that the land described in the patent was of the class of lands granted by the act under which the patent was issued. This identical question was before the Circuit Court for the Southern District of California in the case of Roberts v. Southern Pacific Railroad Co., 186 Fed. 934. In that case Judge Ross held that where Congress had provided for the disposition of any portion of the public domain of a particular character, and had authorized the officers of the Land Department to issue a patent for such land on an ascertainment of certain facts, such department had jurisdiction to inquire into and determine the existence of those facts, and in the absence of fraud, imposition, or mistake, its determination was conclusive against collateral attacks. From this decision complainant appealed to this court, and thereupon this court certified the question, in various forms pertinent to that and another case before this court, to the Supreme Court of the United States for instructions as to a proper decision of the questions. The questions are certified under the title of two cases, namely: Burke v. Southern Pacific Co. (No. 279) see 234 U. S. 669, 34 Sup. Ct. 907, 58 L. Ed. ——, and Lamprecht v. Southern Pacific Co. (No. 280) see 234 U. S. 669, 34 Sup. Ct. 907, 58 L. Ed. ——. Whether a patent issued under the circumstances disclosed in the present case conveys to the grantee an absolute title

to the land described therein, subject only to direct attack for fraud, misrepresentation, or mistake, or whether the conveyance is subject to the reservation excluding mineral lands, should any such be thereafter found in the tracts conveyed, must therefore await the decision of the Supreme Court upon the questions submitted in the cases referred to.

[1] But, assuming that the patent is open to this collateral attack, we are of the opinion that such an attack is not supported by evidence in this case. The defendant introduced evidence tending to show that its predecessors in interest had located placer mining claims upon certain subdivisions of section 27 and other sections in that neighborhood; but no location appears to have been made upon the S. W. ¼ of the S. W. ¼ of section 27, the subdivision in controversy, and the defendant has produced no evidence of any title derived from mining locations made upon that subdivision of section 27. The defendant introduced evidence tending to show that mining operations had been carried on at points on Willow creek above the point where the dam is located, but no evidence that any gold had been taken out at that point or from the subdivision of that section upon which the dam is located. There was no evidence that the boundaries of any claim had been marked upon the ground, so that such boundaries could be readily traced; nor was there any evidence that a notice of such a claim had ever been posted upon the ground or filed in the United States land office, nor was there any evidence tending to show that any steps had been taken under the laws of the United States to obtain title to the ground as mineral ground.

In this state of the evidence we do not think the defendant was in a position to raise the question as to the mineral character of the land in controversy or the general character of the land in the vicinity. The defendant is not a claimant of the land in dispute for its mineral character or its mineral deposits, nor, indeed, is it a claimant there or elsewhere for land on account of its mineral character or its mineral deposits. It has taken possession of the land in dispute, not for the purpose of carrying on mining operations, but to impound waters for irrigation purposes. It was not incorporated to engage in mining operations, or to acquire land for that purpose. It was incorporated—

"to build, establish, and construct, and when established. to maintain and operate, dams, reservoir sites, irrigation ditches, canals, and flumes, together with laterals running therefrom, for the purpose of irrigating lands, and for the purpose of bringing under cultivation desert and unproductive land; to acquire a fee simple title to lands or a lesser interest therein, and to water and irrigate same, and to lease, sell, or dispose of same, either in whole or in part; to operate and construct irrigation system or systems, and the business of furnishing water for irrigation purposes to others under contract of sale or in any other manner whatsoever."

Its object and purpose is to promote agriculture, and the land in dispute is to be used for that object and purpose, and not for the purpose of taking out mineral, or for any mining purposes whatever. That the defendant has taken possession of the land in controversy to maintain and operate a dam for the storage of water for

the purpose of irrigating and bringing under cultivation desert and unproductive lands for agricultural purposes appears to be a sufficient answer to defendant's general claim that the land is mineral land, that it is more valuable for its mineral deposits than for any other purpose, and that therefore it is excluded from the complainant's grant and patent. If the land is more valuable for such agricultural purposes as the defendant proposes than for its mineral deposits, then the land belongs to the complainant under the grant and patent as agricultural land.

[2] It follows that in our opinion there is no actual dispute as to the title to the land upon which defendant is constructing its dam, for the reason that defendant makes no showing of title in itself. But, assuming that there is, the complainant is not in a court of equity without right. While the general rule is that a suit to enjoin a trespass cannot be used and substituted for a proceeding to try the legal title to real property, nevertheless the equitable doctrine is well established that when the nature of the trespass is such as must necessarily go to the destruction of the estate in the character in which it is enjoyed, or the trespass cannot be adequately compensated in damages and the remedy at law is inadequate, a court of equity in such or like cases is authorized to interfere and grant relief by injunction. Hume v. Burns, 50 Or. 124, 127, 90 Pac. 1009.

In Erhardt v. Boaro, 113 U. S. 537, 5 Sup. Ct. 565, 28 L. Ed. 1116, the Supreme Court of the United States held that:

"It is now a common practice in cases where irremediable mischief is being done or threatened, going to the destruction of the substance of the estate, such as the extraction of ores from a mine, or the cutting down of timber, or the removal of coal, to issue an injunction, though the title to the premises be in litigation."

In Northern Pac. R. Co. v. Hussey, 61 Fed. 231, 9 C. C. A. 463, the complainant was a land grant railroad, but the lands opposite to the completed line had not been surveyed, so as to render the odd-numbered sections belonging to the company distinguishable from the even-numbered sections reserved to the United States. It was charged in the bill of complainant that the defendant had entered upon the unsurveyed lands within the limits of the grant and was cutting down the timber therein; but because the complainant could not show title to the land in the complaint, and such title was denied, the Circuit Court dismissed the bill. This court, upon the authority of Erhardt v. Boaro, supra, held that the defendant was engaged in destroying the substance of the estate, and that the interest of the complainant was such that a court of equity would protect the estate by injunction.

In Oolagah Coal Co. v. McCaleb, 68 Fed. 86, 15 C. C. A. 270, the action was for an injunction to restrain trespass upon certain mining ground in the Indian Territory. There was a question of right as between the parties to the action under a license from the Cherokee Nation. The defendant resisted the action on the ground that the complainant had a plain, adequate, and complete remedy at law. The lower court dismissed the bill. The Court of Appeals held that the complainant was not without right to equitable relief, even if it were

true, as the defendant contended, that the bill disclosed a controversy between parties as to who had the superior right to mine coal on the lands in question, which could only be appropriately determined by a court of law. "If such was the fact," said the court, "it would nevertheless be competent for a court of equity to restrain the commission of such trespasses as are charged in the bill, until the controversy existing between the parties is settled by the proper tribunal."

In this case the erection of a dam and the formation of a reservoir by the defendant on the land in dispute is manifestly a destruction of the estate in the character in which it was being used and enjoyed by the complainant. That such a destruction will be an irreparable injury is established by the fact that the defendant does not claim to be able to respond in damages in the event it should finally be determined that the title to the land is in the complainant, and, as a matter of fact, it could not establish its ability to so respond. Its solvency was questioned when the case was argued in this court, and the defendant has since filed its petition in bankruptcy in the United States District Court for the District of Oregon, showing a hopeless state of insolvency. It cannot, therefore, respond in damages in the event the title to the land should be found to be in the complainant.

[3] The objection that the complainant had not been diligent in protecting its alleged rights against the defendant's intrusion upon the land upon which the dam was being constructed cannot be maintained. The evidence shows that the defendant made its appropriation of water from Willow creek by posting notice on April 7, 1908; that on May 19, 1908, the complainant wrote to Leonard Cole, advising him that the complainant held United States patent to lands in sections 21 and 27, township 14 S., range 42 E., which he was undertaking to sell to D. M. Brogan; that complainant intended to assert its right to the same, and would resist any attempt to flood the land, or otherwise enter upon it, by injunction suit. On May 20, 1908, Leonard Cole and others conveyed to the defendant their interest in the mining claims and mining water rights on Willow creek. On June 18, 1908, complainant wrote to the defendant that complainant objected and protested against any occupancy or work theretofore or thereafter done or to be done by the defendant or by any other person upon sections 21 and 27, township 14 S., range 42 E., or any other of its lands, without its consent, and would hold all parties acting contrary to the notice responsible for the consequences. No attention was paid to these notices, either by Leonard Cole or by the defendant, and in October, 1908, this suit was commenced against the defendant. We think this evidence shows that the complainant acted with reasonable diligence in notifying the defendant of its ownership of the land upon which the dam was being constructed and its rights in respect thereto.

[4] We are of opinion that the Circuit Court was also in error in withholding an injunction in this case on the ground that the impounding of the flood waters of Willow creek caused no substantial injury to the complainant. The complainant is the owner of lands riparian to both banks of Willow creek, below the point where the defendant claims the right to divert from the waters of the creek a continuous

flow to the extent of 20,000 cubic inches of water, by miner's measure, under 6 inches of pressure. It will not be necessary to enter into a discussion of the statutes and various decisions of the Supreme Court of Oregon defining riparian rights in that state. We will accept the opinion of the learned District Judge in this case upon that question that:

"The riparian proprietor is entitled to the ordinary and usual flow of a stream as long as it is of any beneficial use to him, and this may, under some circumstances, include flood or overflow waters reasonably to be anticipated during ordinary seasons."

But we do not agree with him that it did not appear from the evidence that the complainant would suffer any substantial injury by the diversion of 20,000 cubic inches of the continuous flow of Willow creek. The creek has its source in the Blue Mountains, where it is fed mainly by the melting snow of that region. The quantity of water flowing in the creek is therefore largely dependent in quantity and duration upon the extent of the snowfall and its melting period in the mountains. In 1904 officers of the government measured the flow of water in Willow creek at a point about 6 miles above the post office at Dell and about 5 miles below defendant's proposed point of diversion. The reported measurements determined the monthly flow of water in the creek in acre feet for the period of a year as follows:

| | | |
|---|---|---|
| January, 1904 | 615 | acre feet |
| February, " | 12,710 | " " |
| March, " | 48,140 | " " |
| April, " | 37,130 | " " |
| May, " | 10,020 | " " |
| June, " | 1,886 | " " |
| July, " | 422 | " " |
| August, " | 31 | " " |
| September, " | 116 | " " |
| October, " | 579 | " " |
| November, " | 530 | " " |
| December, " | 750 | " " |
| Total for the year 1904 | 112,929 | acre feet |

Emory Cole, a witness called for the defendant, had resided in the vicinity of Willow creek for 40 years and assisted the government officers in taking the measurements. He testified that the flow of the creek in the year 1904 was about the average.

In Whited v. Cavin, 55 Or. 98, 109, 105 Pac. 396, 400, the Supreme Court of Oregon found that one inch of water, under 6-inch pressure, miner's measurement, is one-fortieth of a second foot, and furnished a flow of 675 gallons per hour, which in 30 days would furnish 1½ acre feet. By this measurement defendant's right of diversion of 20,000 cubic inches of the continuous flow of Willow creek would be for one month of 30 days the equivalent of 30,000 acre feet of water. Comparing this quantity of water with the average flow of Willow creek as ascertained by the government officers, and we find that such a right of diversion is largely in excess of the average flow of the creek, except during the months of March and April. During the re-

maining 10 months of the year defendant would have the right to divert every drop of water flowing in the creek, leaving no water for the settlers below on lands riparian to the creek, no water for the overflow of complainant's bottom lands during that part of the season when most needed, no water for seepage from the creek through complainant's riparian lands during the late spring and early summer, and no water for stock or for domestic purposes for the tenants on complainant's riparian lands after April or May in each year, a part of the season when most required for the growth of grass for pasture of horses and cattle, and for hay for the remainder of the year when pasture is not available, and for the supply of water in wells for family and other domestic purposes.

Complainant's right to object to this diversion is based upon the fact that it is the owner of 7,120 acres of land in Willow creek valley below the point of diversion, and this ownership is derived through mesne conveyances from the grant of the act of Congress of February 25, 1867. Of this land 3,600 acres lie in the lower level of the creek valley in tracts adjacent to and riparian to the creek, and of these lower tracts about 300 acres are rendered productive of wild grass and other hay crops by the natural overflow of the creek. There is some question as to the quantity of this overflowed land owned by the complainant. Defendant admits in its answer that it amounts to 50 acres. We think that the evidence shows that it amounts to about 300 acres, as claimed by the complainant. The court below did not find that the water of the creek had been applied to a beneficial use by the complainant upon any of its lands, and under recent enactments of the state of Oregon, modifying the law of riparian rights in that state, the court held that complainant was not injured by defendant's diversion of the water of the creek to its nonriparian land.

The evidence shows that part of this overflowed land owned by the complainant had been occupied by tenants; that of this land 134 acres had been inclosed by fence, and the grass grown upon the land had been mowed by the tenants and stacked for hay, and other parts of the overflowed land had been used for pasture; that if this land was deprived of the water flowing in from the creek during the spring and early summer, no grass could be grown for hay, and no pasture grown for stock; that the wells would go dry, and the land become worthless for any purpose; that, on the other hand, with the natural flow of water in the creek, the value of the land as estimated by one of the defendant's witnesses is from $1.25 to $10 per acre, and by one of complainant's witnesses from $30 to $50 per acre, and that the annual rental was about $2 per acre.

The right of the defendant to appropriate from the water of Willow creek a sufficient amount to maintain a continuous flow of 20,000 cubic inches is based upon the law of appropriation, as provided by the laws of Oregon, and the proceedings taken by the defendant thereunder in making such appropriation. These proceedings were not in all respects in accordance with the requirements of the statute. There were several errors and omissions in the notice and other proceedings, but it is claimed by the defendant that these defects have been cured

and the proceedings validated by subdivision 7 of section 70, c. 216 (Act Feb. 24, 1909) Laws of Oregon 1909, which provides as follows:

"7. And where appropriations of water heretofore attempted have been undertaken in good faith, and the work of construction or improvement thereunder has been in good faith commenced and diligently prosecuted, such appropriations shall not be set aside or avoided, in proceedings under this act, because of any irregularity or insufficiency of the notice by law, or in the manner of posting, recording, or publication thereof."

Conceding for the purpose of this case the validity of the proceedings incident to the appropriation, it does not follow that the appropriation divested the complainant of its prior right to water upon its riparian lands. The act of February 18, 1891 (Laws of Oregon 1891, p. 52), as amended by Act February 25, 1901 (Laws of Oregon 1901, p. 137; Lord's Oregon Laws, § 6525 et seq.), providing for the appropriation of water for general use and irrigation and for the condemnation of lands for right of way, makes this exception in section 8:

"But no person owning lands lying contiguous to any natural stream shall, without his consent, be deprived of water for household or domestic use, or for the purpose of watering his stock, or of water necessary to irrigate crops growing upon such lands, and actually used therefor."

In the later act of February 24, 1909, supra, it is provided that:

"1. Nothing in this act contained shall impair the vested right of any person, association or corporation to the use of water.

"2. Actual application of water to beneficial use prior to the passage of this act by or under authority of any riparian proprietor, or by or under authority of his or its predecessors in interest, shall be deemed to create in such riparian proprietor a vested right to the extent of the actual application to beneficial use: Provided such use has not been abandoned for a continuous period of two years." Paragraphs 1 and 2 of section 70.

Whether complainant's riparian rights attached to the larger sectional areas of its land, aggregating 3,600 acres, containing the overflowed land, we do not stop to consider. It will be sufficient to determine whether the complainant had any vested right to the flow of water in Willow creek by reason of its ownership of the overflowed land. We think the evidence shows beyond any question that at least the bottom lands belonging to the complainant immediately adjoining the creek, and amounting to about 300 acres, would be damaged and the value of the land destroyed for any practical use by defendant's diversion of 20,000 cubic inches of the continuous flow of Willow creek. We are of the opinion, therefore, that the complainant has a prior right in the natural flow of the creek to the extent of its accustomed beneficial use of the water upon this land, and we find that this prior right is not only a vested right under the law, but that it is practically conceded by the admissions contained in defendant's answer in this action. It alleges that:

"It is not, and never has been, its purpose or intention in the construction or maintenance of said dam and said reservoir, and the collection and impounding and use of said water, to so obstruct or interfere with the natural flow of the water of said creek as to interfere in any way with the rights of any person in or to the use of any of the waters of said stream, and it alleges that its proposed system of irrigation by means of said dam and said reservoir can and will be carried out without injury or damage to the complainant or to any other person."

[5] What the natural flow of a stream is was determined by Judge Bean, when Chief Justice of the Supreme Court of Oregon, in the case of Price v. Oregon Railroad Co., 47 Or. 350, 358, 83 Pac. 843, 846. Speaking of the flood waters of a natural stream, the learned judge said:

"When such water has found its way into a natural stream or water course, and mingles with the waters thereof, it becomes as much a part of the stream as any other particle of water in it, and ceases to possess any of the qualities of surface water. And the mere fact that for the time being the channel of the stream is not sufficient to carry all the water does not change the rule, so long as the water forms one continuous body and flows in the course of the ordinary channel of the stream. As said in Crawford v. Rambo, 44 Ohio St. 282, 7 N. E. 429: 'It is difficult to see upon what principle the flood waters of a river can be likened to surface water. When it is said that a river is out of its banks, no more is implied than that its volume then exceeds what it ordinarily is. Whether high or low, the entire volume at any one time constitutes the water of the river at such time; and the land over which its current flows must be regarded as its channel, so that, when swollen by rains and melting snows, it extends and flows over the bottoms along its course, that is its flood channel, as when, by droughts, it is reduced to its minimum, it is then in its low-water channel.' If in times of flood any part of the waters of a stream become separated or disassociated from the main body and spreads out over the adjoining country without following any definite water course or channel, it ceases to be a part of the stream and may be regarded as surface water [citing cases]. But, so long as the waters form one continuous body, flowing in the ordinary course of the stream and returning to the natural channel as they recede, they are, properly speaking, waters of a water course, although not confined to the banks of the stream."

In Miller & Lux v. Madera Canal Co., 155 Cal. 59, 99 Pac. 502, 507, 22 L. R. A. (N. S.) 391, the Supreme Court of California had before it the question whether a riparian owner on Fresno river was entitled to restrain an appropriator on the stream above from diverting the increased flow of the river following the annually recurring fall of rain and melting of snow in the region about the head of the stream, when such diversion would deprive the riparian owner of the customary flow of water which was or might be beneficial to his land. The court held that the riparian owner was entitled to have the appropriator restrained from such a diversion. The court in bank, affirming the decision of the court in department, said:

"There is no good reason for saying that the greatly increased flow following the annually recurring fall of rain and melting of snow in the region about the head of the stream is any less usual or ordinary than the much diminished flow which comes after the rains and the melted snows have run off."

In department the court had referred to the flow of the Fresno river and the showing that had been made that practically every year during the winter and early spring months, on account of rainfall and the melting of the snows in the watershed of the stream, the Fresno river carried a large volume of water; that at the highest stages of the flow the water overflowed the main and branch channels of the river at various points and spread over the low-lying lands adjacent thereto, and so continued until the volume of water coming down the stream commenced to lower, when the overflow waters would recede back into the main channel of the river and flow on with the rest of the water;

that this overflow was practically of an annual occurrence, and might be and was anticipated in every season of ordinary rainfall within the watershed of the Fresno river, and failed to occur only in seasons of drouth or exceptionally light rainfall. With respect to this overflow the court said:

"Upon this showing it cannot be said that a flow of water, occurring as these waters are shown to occur, constitutes an extraordinary and unusual flow. In fact, their occurrence is usual and ordinary. It appears that they occur practically every year, and are reasonably expected to do so, and an extraordinary condition of the seasons is presented when they do not occur. They are practically of annual occurrence and last for several months. They are not waters gathered into the stream as the result of occasional and unusual freshets, but are waters which, on account of climatic conditions prevailing in the region where the Fresno river has its source, are usually expected to occur, do occur, and only fail to do so when ordinary climatic conditions are extraordinary—when a season of drouth prevails. As to such waters, it is said in Gould on Waters, § 211: 'Ordinary rainfalls are such as are not unprecedented or extraordinary; and hence floods and freshets which habitually occur and recur again, though at irregular and infrequent intervals, are not extraordinary and unprecedented. It has been well said that "freshets are regarded as ordinary which are well known to occur in the stream occasionally through a period of years though at no regular intervals."' And when such usually recurring floods or freshets are accustomed to swell the banks of a river beyond the low-water mark of dry seasons, and overflow them, but such waters flow in a continuous body with the rest of the water in the stream and along well-defined boundaries, they constitute a single natural water course. * * * It is well determined by the authorities that waters flowing under circumstances such as these, notwithstanding they may consist of a large expanse of water on either side of the main channel, constitute but a single water course and that riparian rights pertain to the whole of it."

The court then refers to the decision of the Supreme Court of Ohio in Crawford v. Rambo, 44 Ohio St. 279, 282, 7 N. E. 429, 431, cited by Judge Bean in Price v. Oregon Railroad Co., supra, and continues:

"So in O'Connell v. East Tennessee Ry. Co., 87 Ga. 246, 13 S. E. 489, 491, [13 L. R. A. 394], 27 Am. St. Rep. 246: 'If the flood water forms a continuous body with the water flowing in the ordinary channel, or if it departs from such channel animo revertendi, as by the recession of the waters, it is to be regarded as still a part of the river. * * * The surplus waters do not cease to be a part of the river when they spread over the adjacent low grounds without well-defined banks or channels, so long as they form with it one body of water eventually to be discharged through the proper channel.' To the same effect are Chicago, etc., Ry. Co. v. Emmert, 53 Neb. 237, 73 N. W. 540, 68 Am. St. Rep. 602; Fordham v. Northern Pacific Ry. Co., 30 Mont. 421, 76 Pac. 1040 [66 L. R. A. 556] 104 Am. St. Rep. 729; Jones v. Seaboard, etc., Ry. Co., 67 S. C. 181, 45 S. E. 188; New York, etc., Ry. Co. v. Hamlet Hay Co., 149 Ind. 344, 47 N. E. 1060, 49 N. E. 269; Cairo, etc., Ry. Co. v. Brevoort (C. C.) 62 Fed. 129 [25 L. R. A. 527]. And where the stream usually flows in a continuous current, the fact that the water of the stream, on account of the level character of the land, spreads over a large area without apparent banks, does not affect its character as a watercourse. Macomber v. Godfrey, 108 Mass. 219, 11 Am. Rep. 349; West v. Taylor, 16 Or. 165, 13 Pac. 665."

These cases refer to conditions similar to those on Willow creek, and under the law of Oregon applicable thereto we think the complainant clearly established its right to the natural flow of the water of

that stream to the extent of the overflowed land, and this right should have been protected by the court.

The act of February 24, 1909 (Laws of Oregon, 1909, pp. 319–343, c. 216 [Lord's Oregon Laws, §§ 6594 to 6672]), provides a system for the regulation, control, distribution, use, and right to the use of water, and for the determination of existing rights thereto within the state of Oregon, and provides for a board of control, of which the state engineer and the superintendents of the two water divisions, into which the state is divided, are made constituent members. This board of control is given authority by the act to determine the relative rights of the various claimants to the waters of a stream; and in case suit is brought in the state court for the determination of rights to the use of water, the case may, in the discretion of the court, be transferred to the board of control for determination as in the act provided. The determination of the board of control, as confirmed or modified as provided by the act, is made conclusive as to all prior rights and the rights of all existing claimants upon the stream or other body of water lawfully embraced in the determination.

The decree of the court below is reversed, and the cause remanded for further proceedings not inconsistent with this opinion, and subject to such proceedings as may be had by the state board of control within its jurisdiction with respect to the rights of the parties herein to the waters of Willow creek.

ROSS, Circuit Judge (concurring). In the case of Roberts v. Southern Pacific Co. (C. C.) 186 Fed. 934, I had occasion to say:

"Can a citizen of the United States, or one having declared his intention to become such, lawfully enter upon and claim as mineral ground land theretofore patented by the government to a railroad company under a congressional grant; such patents, after describing the land thereby conveyed, containing the clause: 'Yet excluding and excepting "all mineral lands," should any such be found in the tracts aforesaid. But this exclusion and exception according to the terms of the statute, shall not be construed to include "coal and iron lands."' The complainants' alleged rights to the lands in question in this suit were, according to their express allegation, not acquired until 15 years after the issuance of patents to the Southern Pacific Railroad Company therefor, at which time they claim to have made mineral locations upon them, and by this suit, the nature of which is variously characterized by their counsel, they ask the court to protect their alleged rights as such mineral locators by some sort of injunctive process by 'controlling' the patents which were issued by the government and which they expressly allege conveyed the legal title to the land to the grantee therein named. If the above-quoted clause inserted in the patents had the effect of excepting from the lands described in the granting clause thereof all of such lands in which mineral might thereafter be found, the discovery of mineral in the lands in suit by the complainants, if such has been made as alleged, 15 years after the issuance of the patents, would undoubtedly defeat the grant under which the defendants hold, for the reason that the clause is without limitation as to time, and a determination by a court or jury, as the case might be, at any subsequent date, however remote, that any of the land described in the granting clause of the patents had turned out to be mineral land, would thereby necessarily determine that such land was never within the terms of the railroad grant made by Congress, notwithstanding the fact that the officers of the government charged with the duty of inquiring into and determining the question and of issuing the government patent for the lands granted had issued such conveyance. A

mere statement of the necessary consequence of the complainants' contention is enough to show that it cannot be sound. It would make of the patents a delusion and a snare, instead of a muniment of title designed for the peace and security of those holding under them. Undoubtedly, if the lands in suit were known to be mineral lands at the time they were applied for by the railroad company under the congressional grant to it, and if the patenting of them was, as alleged by the complainants, procured by means of the false affidavit of its land agent, or through any other fraud on its part, the government, or any one in privity with the government, could justly complain, and by suit brought within the time fixed by Congress for that purpose procure a cancellation of such patents. But this is not such a suit. Neither the government nor any one in privity with the government title is here complaining. The suit is by strangers to that title, for by the express averments of the bill the complainants' alleged rights were not initiated until years after the issuance of the patents which they expressly allege conveyed to the railroad company the legal title to the lands. That the complainants cannot be heard to complain of the alleged frauds upon the government is thoroughly settled by decisions so numerous as to make their citation unnecessary. They must be familiar to all lawyers at all acquainted with the law in respect to the public lands. The only real question, therefore, in the case, is whether the lands in suit are excluded from the patents by reason of the alleged subsequent discovery of mineral therein by the complainants under the exception clause inserted in the patents, already quoted, but which I here repeat: 'Yet excluding and excepting "all mineral lands" should any such be found in the tracts aforesaid. But this exclusion and exception, according to the terms of the statute, shall not be construed to include "coal and iron lands."' Where did the officers of the government charged with the duty of issuing patents for lands granted by Congress get authority to cast upon courts or juries the duty or power of ascertaining and determining the character of the public lands applied for under the grant which Congress devolved upon the land department of the government as a prerequisite to the issuance of a patent therefor? The statutes of the United States will be searched in vain for any such authority, unless it can be deduced from the joint resolution of Congress of June 28, 1870 (No. 87, 16 Stat. 382), relating to the grant to the Southern Pacific Railroad Company made by its preceding act of July 27, 1866 (14 Stat. 292, c. 278)."

The grant under which the patent in the present case was issued was not a railroad grant, and, of course, there was no such joint resolution of Congress—the grant in this case being a wagon road grant. But the cases are entirely similar, and the decision there made precisely in point. I am entirely satisfied of the correctness of that decision, and therefore consider it perfectly clear that the appellant in the present case has shown legal title to the land upon which the appellee entered and undertook to build the large reservoir referred to in the opinion; and for the reasons stated in the opinion I agree that the appellant was entitled to an injunction to prevent such invasion of its rights. And under the laws of the state of Oregon I agree that the appellant as riparian owner upon the creek in question is at least entitled to the reasonable use of such portion of the waters of the stream as have been applied by nature, or its own efforts, to a beneficial use.

GILBERT, Circuit Judge (dissenting). The appellee was engaged in constructing a dam across Willow creek for the purpose of impounding the winter flood waters of that creek, and diverting the same for use in irrigation. The appellant brought the present suit to en-

join the construction of the dam, claiming equitable relief on two grounds: First, that the dam was being constructed upon, and when completed would flood, certain lands belonging to the appellant; and, second, that by impounding the flood waters of the creek the appellee would prevent the occasional flooding of 3,600 acres of lands of the appellant lying at a considerable distance below the dam, which lands were alleged to be subject to annual overflow from the waters of said creek and capable of irrigation therefrom. There was no tenable ground for demurring to the complaint on the ground that the appellant had an adequate remedy at law for the recovery of the possession of the ground occupied by the dam or flooded thereby, for the relief sought as to such lands was coupled with a prayer for an injunction against preventing the annual overflow of the 3,600 acres of land of the appellant so alleged to be annually irrigated thereby. Upon the issues and the testimony, the court below reached the conclusion that, as to the lands actually occupied by the dam and to be flooded thereby, the appellant's remedy was at law, and that no ground was shown for an injunction against the diversion of the winter flood waters from the lands of the appellant lying below the dam, for the reason that the evidence showed that no substantial injury would result to the appellant therefrom. It is now held by the majority of this court that the decree of the court below should be reversed.

One member of this court is of the opinion that the decree should be reversed on the ground that the lands which the appellee will occupy for its dam and reservoir are included within the boundaries of a patent from the United States to the appellant, and that, although said lands are mineral lands, the exception in the patent whereby mineral lands are reserved is void. With that view I am not in accord. The patent was issued under the act of February 25, 1867, which provided that the grant should not embrace mineral lands of the United States. The patent was issued May 28, 1902, and it repeats the exception which was contained in the act in these words:

"Yet excluding and excepting all mineral lands if any such be found in the tract aforesaid."

It is clear from the language of the patent that no investigation whatever was made by the officers of the land office as to the mineral character of the lands, for it grants lands which—

"have been listed by the duly authorized land agent of said company, as shown by its original lists approved by the local officers and now on file in the General Land Office."

As was said by the court below, the patent when read in connection with the act—

"manifests an unmistakable intention on the part of the government not to convey mineral lands, and repels any inference that the department adjudicated or intended to adjudicate that no part of the land described in the patent was mineral."

The appellee acquired the title of the mining claimants to the lands so to be occupied by the dam and reservoir. Those lands lie in the creek bed in a canyon, and have been occupied as mining claims, some

of them since 1862, and the most thereof since 1869. On April 25, 1908, one of the appellant's agents wrote to another of its agents that the land—

"involves about seven miles of creek bed, which has been mined over more or less for the last 35 years."

In another letter he wrote:

"We understand this land along Willow creek has been mined off and on ever since 1862."

In my opinion these mineral lands were excluded from the patent and never passed to the appellant.

The view of the other member of this court is that, conceding that known mineral lands are excluded from the patent, there is, notwithstanding, one tract of 10 acres, the S. W. ¼ of the N. W. ¼ of the S. W. ¼ of section 27, included in the lands to be occupied as a reservoir, upon which no mining location has been made, since no mining location filed in the county clerk's office describes that particular portion of the section, and that therefore that tract of land passed to the appellant, and that the use to which the appellee proposes to put it affords ground for injunction for the reasons: (1) That the threatened trespass will operate to the destruction of the estate of the appellant in that 10 acres; (2) that the appellant has no adequate remedy at law, for the reason that the appellee is insolvent and unable to respond in damages—and that, in any view of the case, the appellant is entitled to an injunction against the diversion of the flood waters which occasionally irrigate the lands of the appellant lying below the dam.

These grounds for reversing the decree, I submit, are not sustained by the evidence. The evidence, I think, fully justifies the conclusion of the court below that all the lands which are to be occupied by the dam and reservoir are mineral lands, are in the possession of the appellee, and have been in the adverse possession of the appellee and its predecessors in interest for more than 10 years prior to the commencement of the suit. The fact that a certain tract of 10 acres in section 27 is not included in any mining location as the locations appear on file in the county clerk's office should not be held to overcome the testimony of witnesses that it has actually been occupied for mining purposes. Mining locations as they have been marked upon the ground prevail over the calls and distances of the recorded notices thereof. But, even if no mining location had actually been placed upon that particular tract, it is nevertheless mineral land, situated in a mineral country, and surrounded by mining claims. This 10 acres of mineral land was in the actual possession of the appellee under a claim of title. The threatened acts of the appellee could cause no destruction thereof or injury thereto. It is undisputed that the land is of no value for agricultural purposes, and that its sole value is in the mineral which it may contain. A complainant out of possession may obtain an injunction against trespass upon real estate only to prevent destruction of the property, and only in cases where it is sought in aid of an action at law, which is pending or is contemplated. Buchanan Co. v. Adkins, 99 C. C. A. 246, 175 Fed. 692; Erhardt v. Boaro,

113 U. S. 537, 5 Sup. Ct. 565, 28 L. Ed. 1116; Whitehead v. Shattuck, 138 U. S. 146, 11 Sup. Ct. 276, 34 L. Ed. 873.

The only proof of the insolvency of the appellee as ground for the appellant's resort to equity for relief is found in a copy of certain proceedings in bankruptcy filed in this court since the submission of the case herein, which shows that the appellee has become insolvent. There was no allegation of its insolvency in the pleadings in this case, and no suggestion thereof was made in the court below or in the record which is presented to us. I submit that the proceedings in bankruptcy have no proper place in the case which is before us, and that we have no right to consider them. The question before us is whether the court erred in the decree which was rendered upon the pleadings and proofs which were before it.

Nor do I think that the trial court erred in its conclusion that the impounding of the winter flood waters of Willow creek would result in no injury to the appellant's lands lying below the dam. The appellant in its bill alleged that 3,600 acres of such lands which it owned were subject to the annual overflow of the waters of the creek and capable of irrigation therefrom. There is no evidence even tending to show that more than one-tenth part of the 3,600 acres has ever been reached at any flood of the creek. On the contrary, the evidence fully sustains the conclusion of the court below that the lands of the appellant which were subject to the occasional and irregular winter overflows consisted of five or six small low-lying parcels of unimproved, uncultivated, and uninclosed land, whose sole crop is wild grass, the total quantity of which does not exceed 40 or 50 acres. The evidence shows that the winter flood does not occur every year, and that it floods these lands but two or three days, and at a time when they are either already saturated with rain and snow, or are frozen so that the water merely passes over their surface. There is credible evidence, also, that these winter floods are an injury rather than a benefit to these lands.

Upon reading the whole of the evidence in this case, no unbiased mind can reach any other conclusion but that the real object of the suit is, not to prevent injury to the appellant's lands, but to checkmate the scheme of the appellee to impound the flood waters of Willow creek, in order that the appellant itself might have the opportunity to organize a scheme to do the very thing which the appellee was engaged in doing. This is fully shown by the correspondence that passed between the appellant and its agents during the 17 months preceding the commencement of the suit. As early as December, 1907, the appellant's agent at Vale, Or., received written instructions to keep close watch upon the operations of the appellee. Said the letter:

"It may become necessary to organize the bench owners and the present water users who have sold, to resist the monopoly of the main flow of the creek."

On December 23, 1907, the general agents at Portland wrote to the appellant at San Francisco, suggesting a combination of landowners to bind themselves together to refuse to take any water from any one—"thereby making it impossible for the company seeking to supply them to do any business, which would cause a lapse of their rights."

The letter recommends that Clagett, the agent at Vale, be instructed to encourage the organization of the landowners in a scheme to oppose the plans of the appellee's predecessors in interest, and suggests that he become a member of the landowners' committee, so that he might obtain inside information concerning developments. The letter suggested that he would be in a position to "checkmate" the landowners' organization. In that letter it was further said:

"Mr. Clagett's view that you have no defined water rights in connection with your Willow creek lands means, we think, at the normal flow. We suppose, as riparian owners of several tracts, you have certain legal rights which could be asserted against the monopoly of the flood waters."

On January 6, 1908, the same agents wrote concerning the efforts of the appellee to obtain control of the reservoir site and of the strategic points along the creek by purchase, and said that if they did so—

"they will probably have the bench landowners at a serious disadvantage. The latter must anticipate their obtaining this control. They should insist in a forceful way on a declaration by the syndicate of their plans. If no satisfaction is obtained, then action should be taken, with the assistance of skilled lawyers and engineers, to prevent the syndicate from getting detrimental control. Your position is the same as that of the individual bench landowners. Your lands will be deferred in their development if some way of bringing water to them is not opened up before the syndicate has obtained the control the methods they employ indicate."

On January 10, 1908, the same agents wrote to the appellant as follows:

"In their present state, your lands in this district are practically only nominally valuable. An irrigation undertaking will make them very valuable, if precaution is taken to bring them in or keep them out, as the shrewdest policy will dictate."

On April 1, 1908, Clagett wrote to the general agents at Portland:

"Must confess we have misgivings in regard to the present situation. We have felt all the time that the Eastern Oregon Land Company was making a mistake in not adopting an active programme in regard to Willow creek, and if we were confident that these people only contemplated a small undertaking, would advise a consideration of steps to secure options upon a portion of Willow creek lands which control vested rights."

When Clagett, on the witness stand, was asked what was the intended purpose of taking options on lands along the creek, he answered:

"It was desired to checkmate them."

The word "checkmate" appears more than once in the correspondence, and to checkmate the scheme of the appellee, Clagett testified, was "undoubtedly" the purpose for which the present suit was brought. In all of the correspondence, and in the notices which were served upon the appellee, there is nowhere a suggestion that the construction of the dam and reservoir and the impounding of the flood waters will cause any actual injury to the appellant's lands, either above or be-

low the dam, or deprive the appellant of flood waters for the irrigation of any portion of the lands, or that it had ever applied any of those waters to a beneficial use.

I submit that the case as it comes to this court should be determined upon the issues that were framed in the court below, and that upon those issues and the evidence the decree of that court was correct, and should be affirmed.